**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY and AMERICAN
MOTORISTS INSURANCE COMPANY,

Plaintiffs,

- against -

PAYTON LANE NURSING HOME, INC.,
PERKINS EASTMAN ARCHITECTS, P.C. and
LINCOLN GENERAL INSURANCE COMPANY,

Defendants.

-----------------------------------------------------------------X

**MEMORANDUM
AND ORDER**

CV 05-5155 (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.    PRELIMINARY STATEMENT

Plaintiffs American Manufacturers Mutual Insurance Company and American Motorists

Insurance Company ("Plaintiffs" or "Sureties") commenced this action against Defendants

Payton Lane Nursing Home, Inc. ("Payton Lane"), Perkins Eastman Architects, P.C. ("Perkins")

and Lincoln General Insurance Company ("Lincoln") (collectively, "Defendants") for, *inter alia*,

breach of contact arising out of the construction of a 700-room, 280-bed nursing home in

Southampton, New York.  Payton Lane is the owner of the property and Plaintiffs acted as

sureties for the original construction contract.  Defendant Perkins is the architect hired by Payton

Lane for the Project, and Defendant Lincoln is a mechanics' lien discharge bond surety.[1]

---

[1]    With regard to the other Defendants named in Plaintiffs' Amended Complaint
[DE 37], Plaintiffs voluntarily dismissed their claims against Defendants Beneson Payton Lane
Purchase LLC and Damon A. Douglas Company [*see* DE 148], and a default judgment was
entered against Defendants Diam-N-Blu Mechanical Corp., International Testing and Balancing,
Ltd. and Bruce A. Peterson, Inc. [*see* DE 150, 151].  Defendant Lincoln also filed cross-claims
against Payton Lane as well as a third-party complaint [DE 70] against Sam Klein, the President
of Payton Lane.  However, Lincoln's cross-claims and third-party claims were resolved by

Presently before the Court is Defendant Payton Lane's Motion for Partial Summary Judgment [DE 138] seeking dismissal of a portion of Plaintiffs' claims in the amount of $423,911.00. Payton Lane argues that the Sureties failed to timely submit five change order requests for corrective work performed on the construction project in accordance with the governing contract and thereby waived such claims. In support of its motion, Payton Lane relies upon its Local Rule 56.1 Statement of Undisputed Facts ("Def.'s R. 56.1 Stmt.") [DE 138-2]; Memorandum of Law in Support of Payton Lane's Motion for Partial Summary Judgment ("Def.'s Mem.") [DE 139]; and the Affirmation of Robert C. Angelillo ("Angelillo Aff.") [DE 138-1], to which numerous exhibits are annexed [DE 138, Exs. A-O]. Defendant also submitted a Reply Memorandum of Law in Further Support of the Motion for Partial Summary Judgment ("Def.'s Reply Mem.") [DE 143], and the Reply Affirmation of Robert C. Angelillo ("Angelillo Reply Aff.") [DE 142], to which additional exhibits are annexed [DE 142, Exs. P-X].

In opposition to the motion, Plaintiffs rely upon their Responses to Defendant's Rule 56.1 Statement (¶¶ 1-32) and Plaintiffs' Counterstatement of Material Facts (¶¶ 33-62) ("Pls.' R. 56.1 Cntrstmt.") [DE 140-1]; Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment ("Pls.' Mem.") [DE 141]; and the Affidavit of Eric Schatz ("Schatz Aff.") [DE 140] as well as the numerous exhibits annexed to the Schatz Affidavit [DE 140, Exs. 1-22]. The Court has considered all of the submissions, the applicable case law, and the positions asserted by counsel during oral argument on the motion. For the reasons set forth below, Defendant Payton Lane's Motion for Partial Summary Judgment is DENIED.

---

Stipulation [DE 169] dated July 1, 2009, which was "so ordered" by this Court on July 9, 2009.

## II.    STATEMENT OF FACTS

### A.    Undisputed Facts

The following facts are drawn primarily from the pleadings and the parties' Rule 56.1

Statements where those facts are not otherwise disputed.  Upon consideration of a motion for

summary judgment, the Court construes the facts in the light most favorable to the non-moving

party.  *See Capobianco v. New York*, 422 F.3d 47, 50 (2d Cir. 2001).

### *1.    The IDI Contract*

Defendant Payton Lane and IDI Construction Company, Inc. ("IDI") entered into a

construction contract dated November 16, 2001 (the "IDI Contract") to build the Payton Lane

Nursing Home in Southampton, New York (the "Project").  Def.'s R. 56.1 Stmt., ¶ 4.  The IDI

Contract provided that the Project would be completed for a fixed price of $29,717,385.00.

Angelillo Aff., Ex D. (IDI Contract), ¶ 3A; Am. Compl. [DE 37], ¶ 8.  On December 3, 2001,

Plaintiffs issued a performance bond to IDI, for the benefit of Payton Lane and HUD, as dual

obligees, in the combined amount of $29,717,385.00.  Am. Compl., ¶ 9; Def.'s Answer to Am.

Compl. ("Answr."), ¶ 9.[2]

### *2.    The Takeover Agreement*

Based on IDI's "defective and/or incomplete" work, Payton Lane terminated the IDI

Contract on May 11, 2004, and called on Plaintiffs to satisfy their obligations under the

performance bond.  Am. Compl., ¶ 13; Answr., ¶ 13; Def.'s Mem. at 2; Pls.' Mem. at 3.  On July

---

[2]          Although Plaintiffs' performance bond was not produced as an exhibit in connection with the instant motion, the Court has examined a copy of the bond because it was produced by Plaintiffs as Exhibit 6 to the Schatz Affidavit in support of their motion for partial summary judgment [DE 162], which will be decided by separate order.

9, 2004, the Sureties and Payton Lane entered into the Takeover Agreement. Def.'s R. 56.1 Stmt., ¶ 7; Angelillo Aff., Ex. E[3]; Pls.' R. 56.1 Cntrstmt., ¶ 7. The Takeover Agreement provided that Greyhawk would continue as the Sureties' "Authorized Representative with regard to completion of the remaining work" on the Project. Def.'s R. 56.1 Stmt., ¶ 9; Pls.' R. 56.1 Cntrstmt., ¶ 9.

### 3. Plaintiffs' Change Order Requests

In August 2004, the Sureties retained E.W. Howell Construction Company, Inc. ("Howell") to serve as their completion contractor for the Project. Am. Compl., ¶ 18; Answr., ¶ 18. Thereafter, the parties discovered numerous deficiencies in the work performed by IDI. Plaintiffs assert that Howell discovered "substantial items of non-conforming work" which were not previously identified by Defendants Payton Lane or Perkins. Pls.' Mem. at 5; Schatz Aff., ¶ 4. Plaintiffs further assert that they paid a total of $2,303,985.00 to Howell for corrective work performed on the Project. Am. Compl., ¶ 22; Pls.' Mem. at 5. Plaintiffs submitted to Payton Lane a series of Change Order Requests ("CORs") seeking payment for the corrective work performed by Howell, including the five CORs at issue in the instant Motion (CORs 8, 11, 14, 19 and 27). Def.'s R. 56.1 Stmt., ¶¶ 10-12; Pls.' R. 56.1 Cntrstmt., ¶¶ 10-12, 32; Am. Compl. ¶ 22;

---

[3]     Plaintiffs object to the version of the Takeover Agreement annexed as Exhibit E to the Angelillo Affidavit because it omits Exhibits A and B to the Takeover Agreement. Pls.' R. 56.1 Cntrstmt., ¶ 7; Schatz Aff. n. 1. Plaintiffs assert that the complete version of the Takeover Agreement is annexed as Exhibit 1 to the Schatz Affidavit. Schatz Aff., ¶ 3. Plaintiffs further note that Perkins was not a party to the Takeover Agreement. Pls.' R. 56.1 Cntrstmt., ¶ 47. However, this issue need not be determined here because there is no dispute concerning the provisions at issue here and, in any event, Defendant agrees, for purposes of this motion only (and with a full reservation of its rights), to rely upon the version of the Takeover Agreement annexed as Exhibit 1 to the Schatz Affidavit. Def.'s Reply Mem. at 5.

Angelillo Aff., Exs. F, I, K, M, N.[4]  According to Plaintiffs, each of CORs 8, 11, 14, 19 and 27 were submitted directly to Payton Lane and sought compensation for "defective work outside the scope of work per the Takeover Agreement."  Pls.' R. 56.1 Cntrstmt., ¶ 48; Schatz Aff. ¶ 5 and Ex. 19.

COR 8 seeks $34,955.00 for corrective work performed on the gas main header piping. Def.'s R. 56.1 Stmt., ¶ 16; Pls.' R. 56.1 Cntrstmt., ¶¶ 16, 49.  According to Plaintiffs, the deficiencies in the gas main header piping were initially identified by the plumbing subcontractor and a Keyspan inspector on October 27, 2004 and were subsequently discussed at the November 2, 2004 project meeting which was attended by representatives of Plaintiffs, Payton Lane and Perkins.  Pls.' R. 56.1 Cntrstmt., ¶¶ 49-50; Schatz. Aff., Ex. 2.  On November 12, 2004, Perkins' representative Charles F. Williams sent an email discussing the nonconforming gas main header piping work.  *Id.*, ¶ 51; Schatz Aff., Ex. 3.

COR 11 seeks $31,194.00 for corrective work performed on a faulty feeder cable on the west side of the building.  Def.'s R. 56.1 Stmt., ¶ 20; Pls.' R. 56.1 Cntrstmt., ¶¶ 20, 52. According to Plaintiffs, the faulty feeder cable was listed on Greyhawk's November 12, 2004

---

[4]     Plaintiffs object to the versions of the five CORs annexed by Payton Lane to its Motion on the grounds that (1) the CORs included additional documentation which was omitted from the exhibits, and (2) the CORs were subsequently updated from the versions annexed as Defendant's exhibits.  *See* Pls.' R. 56.1 Cntrstmt., ¶¶ 13, 17, 21, 25, 28.  Plaintiffs further object to Defendant's inclusion of excerpts of deposition testimony and meeting minutes regarding the CORs, which Plaintiffs assert "mischaracterize" that testimony and do not support any material fact that Payton Lane may be attempting to establish.  *See id.*, ¶¶ 14, 15, 18, 22, 26, 29. However, as described above, the parties do not dispute the amounts of the CORs and the descriptions of the work included therein.

Critical Item list (Angelillo Aff., Ex. J),[5] which was distributed and discussed at the November 16, 2004 project meeting attended by representatives of the Sureties, Payton Lane and Perkins. Def.'s R. 56.1 Stmt., ¶ 19; Angelillo Aff., Ex. J; Pls.' R. 56.1 Cntrstmt., ¶ 52; Schatz Aff., Ex. 19.

COR 14 seeks $25,804.00 for engineering consulting costs associated with analyzing corrective structural work. Def.'s R. 56.1 Stmt., ¶ 24; Pls.' R. 56.1 Cntrstmt., ¶¶ 24, 53. On December 2, 2004, E.W. Howell received pricing from Feld, Kaminetsky & Cohen regarding the consultancy costs associated with the corrective structural work described in COR 14. Pls.' R. 56.1 Cntrstmt., ¶ 54; Schatz Aff., ¶ 8 and Ex. 5. This work was addressed at several project meetings, including the December 4, 2004 project meeting, which was attended by representatives of the Sureties, Payton Lane and Perkins, all of whom received copies of the written minutes. *Id*.

COR 19 seeks $53,718.00 for corrective work associated with the adjustment of plumbing roughing for water carriers at the resident lavatories to meet ADA requirements. Def.'s R. 56.1 Stmt., ¶ 27; Pls.' R. 56.1 Cntrstmt., ¶¶ 27, 55. According to Plaintiffs, on November 1, 2004, Aztec Plumbing, the plumbing subcontractor, identified the nonconforming plumbing work. Schatz Aff. ¶ 9; Pls.' R. 56.1 Cntrstmt., ¶ 55. Then, on November 8, 2004, Aztec notified Greyhawk of the condition and submitted pricing for the corrective work. *Id*.[6]

---

[5]     Plaintiffs object to the version of the November 12, 2004 Critical Item list annexed by Payton Lane to its Motion on the grounds that such version contains handwriting not found on the original Critical Items list. *See* Pls.' R. 56.1 Cntrstmt., ¶ 19.

[6]     In his Affidavit, Schatz asserts that "Howell solicited and received pricing from Aztec Plumbing on *November 8, 2004* [and] caused the corrective work to be performed on a time and material basis between December 1, 2004 and January 26, 2005." Schatz Aff. ¶ 9

This plumbing work was discussed at several project meetings, including the November 16 and November 23, 2004 meetings, which were attended by representatives of the Sureties, Payton Lane and Perkins, all of whom received copies of the written minutes. Pls.' R. 56.1 Cntrstmt., ¶ 56; Schatz. Aff., ¶ 9 and Ex. 6.

COR 27 seeks $278,240.00 for work performed on the exterior siding and trim. Def.'s R. 56.1 Stmt., ¶ 31; Pls.' R. 56.1 Cntrstmt., ¶¶ 31, 57. According to Plaintiffs, these deficiencies were first noted by Perkins in its September 20, 2004 Field Observation Report; Payton Lane's representative also participated in such field observation. Pls.' R. 56.1 Cntrstmt., ¶ 57; Schatz Ex. 19; Angelillo Aff., Ex. O. On October 8, 2004, representatives of Payton Lane, Perkins and Plaintiffs met to discuss several Project issues, including the nonconforming work identified in the Perkins Field Observation Report. Pls.' R. 56.1 Cntrstmt., ¶ 58; Schatz Aff., ¶ 10 and Ex. 7. The "cedar siding" which was part of the work described in COR 27 was included in an agenda sent by the Sureties to Defendants in advance of the October 8, 2004 meeting. Pls.' R. 56.1 Cntrstmt., ¶ 59; Schatz Aff., ¶ 10 and Ex. 7.

In total, Plaintiffs paid Howell $423,911.00 for work performed pursuant to CORs 8, 11, 14, 19 and 27. Def.'s R. 56.1 Stmt., ¶ 32; Pls.' R. 56.1 Cntrstmt., ¶ 32[7]; Def.'s Reply Mem. at 4.

---

(emphasis added). In the Rule 56.1 Counterstatement, Plaintiffs state that Aztec "submitted pricing for corrective work" on *October 8, 2004* (Pls.' R. 56.1 Cntrstmt., ¶ 55 (emphasis added)), which the Court assumes was an inadvertent typing error.

[7]    Although Plaintiffs state that they "deny" Payton Lane's Statement of Undisputed Fact Number 32, they nonetheless "admit" that the "Sureties seek damages of $423,911.00 in the Amended Complaint for items of work described in CORs 8, 11, 14, 19 and 27." Pls.' R. 56.1 Cntrstmt., ¶ 32.

III. **THE PARTIES' CONTENTIONS**

A. **Defendant's Position**

Defendant Payton Lane argues that Plaintiffs' claims for $423,911.00 in connection with

CORs 8, 11, 14, 19 and 27 should be dismissed because the "undisputed evidence" shows that

Plaintiffs failed to give timely notice of such claims, as required by the relevant contracts. Def.'s

Mem. at 7. Specifically, Payton Lane asserts that each COR is a "Claim," which is defined under

section 4.3.1 of the IDI Contract[8] as follows:

> A Claim is a demand or assertion by one of the parties seeking, as a
> matter of right, adjustment or interpretation of Contract terms,
> payment of money, extension of time or other relief with respect to
> the terms of the Contract. The term "Claim" also includes other
> disputes and matters in question between the Owner and Contractor
> arising out of or relating to the Contract. Claims must be made by
> written notice. . . .[9]

Def.'s R. 56.1 Stmt., ¶ 6; Angelillo Aff., Ex. D (IDI Contract), ¶ 4.3.1; Def.'s Mem. at 3. Thus,

Defendants maintain that the 21-day notice provision contained in Section 4.3.3 of the IDI

Contract likewise applies to the CORs at issue here. Section 4.3.3 provides as follows:

> Claims by either party must be ***made*** within 21 days after occurrence

---

[8]    As discussed above, Payton Lane contends that the terms and conditions of the
IDI Contract were incorporated by reference into the Takeover Agreement and thus apply to
Plaintiffs' CORs at issue here.

[9]    Plaintiffs contend that the portion of Paragraph 4.3.1 of the IDI contract quoted by
Payton Lane "is a misleading and highly truncated excerpt from ¶4.3.1 of the 1987 A201 General
Conditions. The provisions of ¶4.3.1 of the 1997 version of A201 differ from the applicable
provisions of the 1987 version by substituting the word 'initiated' in place of the word 'made.'"
Pls.' R. 56.1 Cntrstmt., ¶ 6; Schatz Aff. ¶ 25 and Ex. 22. However, this issue need not be
determined here because Plaintiffs "do not believe that it is material to the motion" (Schatz Aff.,
¶¶ 24-25), and, in any event, Defendant agrees, for purposes of this motion only (and with a full
reservation of its rights), to rely upon the version of the IDI Contract Takeover Agreement
annexed as Exhibit 22 to the Schatz Affidavit. Def.'s Reply Mem. at 5.

of the event giving rise to such Claim or within 21 days after the
claimant first recognized the condition giving rise to the Claim,
whichever is later.  Claims must be made by written notice . . . . [10]
(Emphasis added.)

Def.'s R. 56.1 Stmt, ¶ 5; Angelillo Aff. Ex. D, ¶ 4.3.3; Def.'s Mem. at 4.

Defendant argues that the deposition testimony of Eric Schatz and certain referenced

documents show that Plaintiffs did not furnish the requisite written notice within the 21-day time

period.  Def.'s Mem. at 7.  With regard to COR 8 (gas main header pipe), Payton Lane contends

Schatz's deposition testimony shows that Greyhawk was aware of the problems associated with

the gas main header pipe as early as November 10, 2004.  Def.'s Mem. at 8; Angelillo Aff., Ex. F

(COR 8, Jan. 19, 2005); Ex. G (Schatz Dep.) at 115-16; Ex. H (Nov. 10, 2004 Mtg. Mins.).

However, COR 8 was not submitted to Payton Lane until January 19, 2005, or, as Payton Lane

maintains, "70 days after recognizing the condition giving rise to the claim."  Def.'s Mem. at 8.

Regarding COR 11 (replacement of feeder cable), Defendant asserts that Schatz's

deposition testimony shows Greyhawk was aware of the need to replace the feeder cable as early

as November 12, 2004.  Def.'s Mem. at 9-10; Angelillo Aff., Ex. G at 127-29; Ex I (COR 11,

Jan. 19, 2005); Ex. J ("Critical Items List," Nov. 12, 2004).  However, COR 11 was not

---

[10]     Plaintiffs assert that the three versions of the IDI Contract all refer to "the current
edition of AIA Document A201, 'General Conditions of the Contract for Construction,' as being
part of the 'Contract Documents' between Payton Lane and IDI . . . The *1997* version of A201
was the current version of A201 as of both the alleged November 16, 2001 date of the IDI
Contract and the '11/00' date of the form HUD-92442 . . . . However, Payton Lane's Exhibit D
incorrectly includes what appears on its face to be a copy of the *1987* version of A201 . . . . The
provision quoted by Payton Lane is an excerpt from ¶4.3.3 of the 1987 A201 General Conditions.
The provision of the applicable paragraph of the 1997 version of A201 differs from the
applicable provisions of the 1987 version by substituting the word 'initiated' in place of the word
'made.'"  Pls.' R. 56.1 Cntrstmt. ¶¶ 4-5, 33-35; Schatz. Aff. ¶ 25, Ex. 22.  However, for the
reasons stated in the previous footnote, this issue need not be resolved here.

submitted to Payton Lane until January 19, 2005, or, as Payton Lane asserts, "68 days after recognizing the condition giving rise to the claim." Def.'s Mem. at 9.

With respect to COR 14 (structural engineering consulting), Payton Lane maintains that Schatz's deposition testimony shows Greyhawk was aware of the need for the structural engineering consulting as early as December 3, 2004. Def.'s Mem. at 10-11; Angelillo Aff., Ex. G at 129-33; Ex. K (COR 14, Jan. 19, 2005); Ex. L (Dec. 3, 2004 Howell fax proposal). However, COR 14 was not submitted to Payton Lane until January 20, 2005, or, according to Payton Lane, "48 days after recognizing the condition giving rise to the claim." Def.'s Mem. at 12.

With regard to COR 19 (remedial plumbing work at lavatories), Defendant claims Schatz's deposition testimony shows that Greyhawk was aware of the need for the remedial plumbing as early as November 9, 2004. Def.'s Mem. at 12; Angelillo Aff., Ex. G at 135; Ex. M (COR 19, Jan. 20, 2005). However, COR 19 was not submitted to Payton Lane until January 20, 2005, or as Payton Lane contends, "72 days after recognizing the condition giving rise to the claim." *Id*.

With respect to COR 27 (additional exterior siding), Defendant argues Schatz's deposition testimony shows that Greyhawk was aware of the need for additional exterior siding remediation as early as September 20, 2004. Def.'s Mem. at 12-13; Schatz Aff., Ex. G at 136-37; Ex. N (COR 27, Jan. 20, 2005); Ex. O (Perkins Field Observation Report, Sept. 9, 2004). However, COR 27 was not submitted to Payton Lane until January 20, 2005, or according to Payton Lane, "133 days after recognizing the condition giving rise to the claim." Def.'s Mem. at 12.

With regard to the scope of the Takeover Agreement, Payton Lane asserts that Exhibit A to the Takeover Agreement did not limit "the scope of remaining work[.]"  Def.'s Reply Mem. at 3.  To the contrary, Defendant maintains that, pursuant to the contract documents and Plaintiffs' bond, Plaintiffs were required "to complete the IDI Contract in accordance with its terms and conditions." *Id*., at 2-3.  To this end, Defendant points to the deposition testimony of Plaintiffs' witnesses Wayne Everson, who signed the Takeover Agreement, and Rick Anastasio, a Greyhawk representative on the Project, both of whom, according to Defendants, "confirm[ed] that plaintiffs were bound by the terms and conditions of the IDI Contract."  *Id*. at 3, 6-7; Angelillo Reply Aff., ¶¶ 4-5 and Exs. P, Q.

**B.    Plaintiffs' Position**

***1.    The Procedures Followed For Submission Of The CORs***

According to the Affidavit of Eric Schatz,[11] the Project Consultant for Greyhawk, soon after commencing work on the Project in August 2005, "Howell and/or Perkins identified a significant amount of nonconforming work" which had been done by IDI, but which was not previously disclosed by Payton Lane.  Schatz Aff., ¶ 4.  Plaintiffs refer to this work as "additional corrective work," and assert that such work was beyond the scope of the Takeover Agreement. *Id*.  Thus, pursuant to the Takeover Agreement, Plaintiffs "pursued payment for this additional corrective work beyond the scope of the Takeover Agreement directly from Payton Lane through

_____

[11]    The Schatz Affidavit [DE 140] was submitted by Plaintiffs as part of their opposition to Payton Lane's summary judgment motion.  Schatz became involved with the Project in December 2003 and, following the execution of the Takeover Agreement in July 2004, was responsible for, *inter alia*, coordination with the completion contractor Howell and its subcontractors, reviewing Howell's requests for additional work, and submitting CORs for additional work to Payton Lane.  Schatz participated in the preparation of the five CORs at issue here. *See* Schatz Aff., ¶ 2.

change orders." *Id*. The Schatz Affidavit sets forth in some detail the process followed by Greyhawk for submitting CORs. Once nonconforming work was identified, such work was discussed at subsequent Project meetings, which were attended by representatives of the Sureties, Payton Lane and Perkins. *Id*., ¶ 5. Plaintiffs point to documents, including meeting minutes, emails and "critical items" lists, which reflect that the work performed pursuant to the CORs was discussed by the parties at such meetings, contemporaneously with the Sureties' discovery of the additional non-conforming work. These discussions occurred several months before the CORs were submitted. *See, e.g.*, Schatz Aff., Ex. 2 (Nov. 2, 2004 Mtg. Mins. at 7); Ex. 3 (email from Perkins re : "Gas pains . . ."); Ex. 4 (Critical Items List for week ending Nov. 12, 2004, discussed at Nov. 16, 2004 Mtg.); Ex. 5 (Dec. 14, 2004 Mtg. Mins. at 5); Ex. 6 (Nov. 16, 2004 Mtg. Mins. at 5); Ex. 7 (Agenda for Oct. 8, 2004 Mtg. at 4). According to Schatz, Howell then obtained pricing to correct the work and submitted such pricing to Greyhawk. Schatz Aff., ¶ 5. Following Greyhawk's review and negotiation of the pricing, Greyhawk authorized Howell to perform the work. *Id*. Often (as is the case with four of the five CORs at issue here), the CORs were completed on a time and material basis, because, Plaintiffs maintain, it was not practical to obtain a lump sum price. *Id*. After Howell performed the work and Greyhawk obtained the final costs (or a more accurate assessment of the costs), Greyhawk submitted formal CORs for this work directly to Payton Lane. *Id*. Payton Lane apparently does not contest the method of submission of the CORs since it has not submitted any rebuttal testimony or affidavit -- rather, Payton Lane's arguments focus exclusively on the timing of those submissions.

### 2. *Article 7 Of The Takeover Agreement*

Plaintiffs argue that they were not required to provide notice of the CORs because the

12

notice requirement set forth in Article 4.3.3 of the General Conditions of the IDI Contract does not apply to CORs 8, 11, 14, 19 and 27. Rather, Plaintiffs contend, Article 4 governs the Architect's responsibilities on the Project and applies to "Claims," which are distinct from the change orders/CORs at issue here. Pls.' Mem. at 2, 9. According to the Schatz Affidavit, "claims for 'payment of money," as defined under Article 4, "refer to claims for inefficiency or other delay associated impacts, such as labor and material escalation . . . ." Schatz Aff., ¶ 23. The CORs, by contrast, pertain to work which falls outside the scope of the Takeover Agreement, Plaintiffs argue, and are therefore governed by Article 7 of the IDI Contract, entitled "Changes In The Work." Plaintiffs note that Article 7 does not contain any time limit for providing notice. *Id*. at 9-10; Schatz Aff., Exs. 1, 22.

According to Plaintiffs, the Takeover Agreement was intended to be limited in scope -- *i.e.*, to apply to the completion of less than all of the work required by the Contract Documents. In other words, Plaintiffs assert, the scope of the Takeover Agreement is explicitly defined in Exhibit A to that Agreement, which sets forth the "binding description of the work now remaining to be performed by Plaintiffs on the Project." Pls.' R. 56.1 Cntrstmt., ¶¶ 39-40; Schatz Aff., ¶ 3 and Ex. 1. Moreover, Plaintiffs contend that the scope of the work as set forth in Exhibit A specifically includes change orders which had previously been approved. Pls.' R. 56.1 Cntrstmt., ¶¶ 40-41; The Takeover Agreement provides that the work Plaintiffs would perform pursuant to these previously-approved change orders was included in the contract balance which was to be paid to Plaintiffs under that agreement.[12] Am. Compl. [DE 37], ¶ 15; Takeover

---

[12]     The Takeover Agreement provides that the Contract price was $30,317,327.00, of which $22,916,335.00 had been paid by Payton Lane to IDI. Under the Takeover Agreement, the remaining contract balance of $7,400,972.00 (inclusive of the retainage of $2,458,216.00) was to

Agreement, ¶ 5(a)-(c).  Plaintiffs emphasize that the Takeover Agreement also provided that they would be paid additional amounts (above the remaining contract balance) for any additional or extra work, defined as "work that is different from, in excess of, or beyond the scope of the work required by this Agreement . . . ."  Pls.' Mem. at 10; Takeover Agreement, ¶ 5(d).  Because the CORs cover additional corrective work (outside the scope of the work set forth in the Takeover Agreement), according to Plaintiffs, the procedures for negotiating and resolving such work were governed by Article 7 of the General Conditions of the IDI (not Article 4), which does not contain any time limit for providing notice.  Schatz Aff., ¶ 23; Pls.' R. 56.1 Cntrstmt., ¶¶ 44-45.

Plaintiffs further point to the fact that Article 4 governs Perkins' responsibilities on the Project and that "Claims" brought under Article 4 were to be submitted to and decided by Perkins.  Pls.' Mem. at 4.  However, the CORs at issue here were submitted by Plaintiffs directly to Payton Lane and, according to Plaintiffs, were intended to be decided by Payton Lane.  *Id.*; Schatz Aff., ¶ 5; Pls.' R. 56.1 Cntrstmt., ¶¶ 46-48.  Plaintiffs maintain that if Defendant's interpretation of the Contract (*i.e.*, that Article 4 applied to the CORs) were to be accepted, it would produce an "incongruous" -- namely that Plaintiffs agreed that "in order to be entitled to payment for extra work items that Payton Lane might demand, the Sureties would have to submit to Perkins as the initial arbiter of that requested change order."  Pls.' Mem. at 11.  According to Plaintiffs, the "suggestion that Perkins was the initial arbiter" is "absurd[]" because it was "**Perkins's** own failure to detect the non conforming conditions during IDI's tenure on the Project that necessitated the Sureties having to perform the work included in the corrective work

_____

be paid to Plaintiffs for performance of the work, the scope of which was set forth in the Takeover Agreement.  Takeover Agreement, ¶ 5(a)-(d).

CORs." *Id*. at 12 (emphasis in original).

### 3. Issues Of Material Fact With Respect To Application Of Article 4

In the alternative, Plaintiffs argue that, even if the Court were to find that Article 4 applies to the CORs at issue here, Plaintiffs have presented sufficient evidence regarding the parties' "course of conduct" to show the existence of material issues of fact as to whether Payton Lane waived the 21-day notice requirement. Pls.' Mem. at 13-14. First, Plaintiffs contend that they have demonstrated the existence of a material issue of fact whether the pre-COR communications referenced by Defendants -- including discussions at the Project meetings where the corrective work issues were addressed and recorded in the minutes of such meetings -- served to timely initiate the claims. *Id*. at 16.

Second, Plaintiffs claim that they have demonstrated a material issue of fact whether the parties' course of conduct modified any contract provisions. *Id.* In opposition, Payton Lane argues that in light of Section 13.4.2 of the IDI Contract, Plaintiffs' waiver argument is unavailing. Def.'s Reply Mem. at 11-12. Section 13.4.2 provides as follows:

> No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded to them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed to in writing.

Schatz Aff., Ex. 22, ¶ 13.4.2. Thus, according to Payton Lane, the IDI Contract required any amendment to be made in writing so that, under the express terms of that agreement, Payton Lane could not have waived the notice requirement by its course of conduct. Def.'s Reply Mem. at 11-12.

Third, Plaintiffs maintain that there exists an issue of fact "as to which notice of claim

provision is applicable - the one contained in the 1987 version of the AIA General Conditions A201 or the one contained in the 1997 version.  The 1997 version contains a more liberal standard of 'initiating' rather than 'making' a claim within the 21 day period'."  *Id*. at 16 (*compare* Angelillo Aff., Ex. D *to* Schatz Aff., Ex. 22).  Finally, Plaintiffs assert that under the applicable case law, in the context of a dispute over the timeliness of a claim notice, "the issue of what is and what is not a proper notice is a material issue of fact."  Pls.' Mem. at 17-18.

### 4.    *Defendant Included CORs In Submissions To New York State Department of Health*

According to Plaintiffs, Payton Lane applied to the New York State Department of Health ("DOH") in 2005 for approval of a higher construction cost (which would lead to a higher Medicaid cost reimbursement for Defendant).  Pls. Mem. at 20; Schatz Aff., ¶ 22 and Ex. 18.  In support of its application, Payton Lane submitted Plaintiffs' CORs, including the five CORs at issue here.  Pls.' Mem. at 20; Schatz Aff., ¶ 21 and Exs. 15, 16, 19.  However, Payton Lane did not include Perkins' letters rejecting the CORs.  Plaintiffs argue that Payton Lane's inclusion of these CORs in its submission to the DOH (and its seeking a cost increase based upon, in part, these CORs) constitutes an admission "that the costs to perform this work had been incurred or would be incurred by Payton Lane."  Pls.' Mem. at 20.  To that end, Plaintiffs contend it is not credible for Payton Lane to now maintain that these CORs should not be paid.  *Id*.; Schatz Aff., ¶ 22.  Moreover, Plaintiffs claim that, under New York law, Payton Lane should not be permitted to make such representations to DOH, accept the benefits of such representations (in the form of approval of the higher construction cost), and now deny such representations under different circumstances.  *Id*. at 21 (discussing cases).

In opposition to this point, Payton Lane argues, *inter alia*, that Plaintiffs' discussion "misconstrues the nature of" Defendant's submissions to the DOH and "ignores subsequent filings with DOH that completely refute plaintiffs' erroneous conclusions."  Def.'s Reply Mem. at 20-22.

### 5.  *Defendant Waived Any Failure To Meet Condition Precedent*

Finally, Plaintiffs argue that Defendants have waived their claim based on Plaintiffs' purported failure to comply with the condition precedent regarding the notice requirement because Payton Lane did not plead such claim as an affirmative defense or otherwise deny the performance of the condition precedent with particularity as required under Rule 9(c).  Pls.' Mem. at 21-22.  In opposition, Payton Lane contends, *inter alia*, that it pled such affirmative defense in its motion to dismiss and therefore it has complied with Rule 9(c).  Def.'s Reply Mem. at 17- 20.

## III.  DISCUSSION

### A.  Standard of Review

In reviewing a motion for summary judgment, the Court is guided by the tenets set forth in Federal Rule of Civil Procedure 56(c), which provides, in part:

> . . . The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law . . . .

Fed. R. Civ. P. 56; *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006); *Gray v. Lutheran Social Servs. of Metro. New York., Inc.*, No. 04-2843, 2006 WL 1982859, at *3 (E.D.N.Y. Jul. 13, 2006).  The moving party bears the burden of meeting this

exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In addition, to determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party. *Id.* at 157; *Fischl v. Armitage*, 128 F.3d, 50, 55 (2d Cir. 1997).

Where the movant shows prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.*; *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("[e]ven where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor").

"If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Fischl*, 128 F.3d at 56 (citing *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997)). On the other hand, Rule 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to material fact and that the movant is entitled judgment as a matter of law." Fed. R. Civ. P. 56(e)(2). In other words, summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

*see also Dobbs v. Dobbs*, No. 06 CV 6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) (the Court's goal should be to "isolate and dispose of factually unsupported claims . . . .").

### B.     Analysis

The limited issue to be decided on this motion for partial summary judgment is whether there are issues of material fact with respect to what obligation, if any, Plaintiffs had to provide notice to Payton Lane "within 21 days after . . . first recogniz[ing] the condition[s] giving rise to" the CORs.  IDI Contract, ¶ 4.3.3.  Essential to the resolution of that issue is a determination whether the procedure for submitting the CORs is governed by Article 4 or Article 7 of the General Conditions of the IDI Contract.  That question depends upon whether the work performed under the CORs was within the scope of the Takeover Agreement.

### 1.     *Scope Of The Takeover Agreement*

As noted above, Payton Lane asserts that the scope of the Takeover Agreement is governed by the IDI Contract, which was incorporated by reference into the Takeover Agreement.  Payton Lane further contends that the IDI Contract defines the entirety of the work to be performed on the Project by Plaintiffs.  According to Payton Lane, the work performed under the CORs was within the scope of the Takeover Agreement and thus Plaintiffs are not entitled to any additional payment, above the Contract Balance, for such work.

Plaintiffs do not dispute that the Takeover Agreement incorporates the IDI Contract by reference.  However, Plaintiffs argue that the Takeover Agreement is limited in scope and did not include the entirety of the work to be performed on the Project.  Rather, according to Plaintiffs, the terms of the Takeover Agreement reflect the parties' understanding that it was possible that additional work, outside the parameters set forth in the Takeover Agreement, would need to be

done.  Plaintiffs point to the following specific language of Paragraph 3 which was omitted from

Payton Lane's recitation of this portion of the Takeover Agreement:

> 3.  The Sureties shall cause the performance of the work as defined
> by Exhibit A, which is incorporated in this Agreement as the
> binding description of the work now remaining to be performed.

Pls.' R. 56.1 Cntrstmt., ¶ 8; Schatz Aff., ¶ 3 and Ex. 1, ¶ 3.

Plaintiffs maintain that, pursuant to its terms, the scope of the Takeover Agreement is set

forth in Exhibits A and B to that Agreement.  Moreover, according to Plaintiffs, the work

performed under the CORs was *additional* corrective work, which fell outside the scope of the

Takeover Agreement.  In support of this point, Plaintiffs emphasize that Exhibit A, which is in

the form of a Request for Proposal ("RFP"), includes several specific items of corrective work

and a non-conforming work notice log (the "NCWN Log").  Pls.' Mem. at 4-5.  The NCWN Log

was maintained by Perkins and listed the non-conforming work performed by IDI which had

been identified prior to the execution of the Takeover Agreement.  *Id*.  According to Plaintiffs,

because the corrective work performed in connection with CORs 8, 11, 14, 19 and 27 was not

listed in the NCWN Log, (1) such work fell outside the scope of the Takeover Agreement,

(2) claims for deficient work not included in the log were released by Payton Lane, and

(3) Plaintiffs are consequently entitled to additional payment for such work.  *Id*.; Schatz Aff. ¶ 3.

The parties agree that the IDI Contract is incorporated by reference into the Takeover

Agreement.  However, the Takeover Agreement also makes clear that, where the terms of the IDI

Contract were modified, the Takeover Agreement supersedes the IDI Contract.  Specifically,

Paragraph 20 of the Takeover Agreement provides as follows:

> This Takeover Agreement constitutes the entire agreement between

the parties and supersedes any and all prior agreements, arrangements and understandings between the parties. Except as *modified by this Agreement*, all rterms and conditions of the [IDI] Contract and Bonds are hereby ratified and remain in full force and effect.

*Id.*, ¶ 20 (emphasis added); *see also id.*, Intro. ¶ 17 ("Whereas Payton Lane and the Sureties accordingly have agreed: . . . (b) that Sureties shall take over and proceed with completion of the Project *in accordance with this Agreement*.") (Emphasis added).

Payton Lane asserts that the deposition testimony of Wayne Everson and Rick Anastasio (both of whom worked for Greyhawk) shows that "the correction of the defective work by IDI, including work which was not known at the time of entry into the Takeover Agreement, was within the plaintiffs' scope of work." Def.'s Reply Mem. at 3 (citing Angelillo Reply Aff., Ex. P, p. 94). However, upon closer examination, the deposition testimony does not support this deduction.[13] The Angelillo Reply Affidavit quotes the portion of Everson's testimony in which he states that the IDI Contract was incorporated into the Takeover Agreement and that the Sureties took over IDI's "rights and obligations under the main contract." Angelillo Aff., Ex. P, 78:12- 80-1. However, further on in his testimony, Everson stated it was his understanding that the Takeover Agreement modified Plaintiffs' obligations as they were defined in the IDI Contract. *Id.* Specifically, Everson's deposition testimony was as follows:

> Q: Okay. So now we can go to page 4. And in paragraph 1 [of the IDI Contract] under the term Agreement, it says the contract is incorporated by reference.
>
> A: Correct.
>
> Q: And you can read the rest. What is your understanding of what

---

[13] The Court notes that Defendant submitted only several selected pages from the transcripts of the Everson and Anastasio depositions.

that provision means?

A: Well, the contract itself -- I mean, it would have to be incorporated into any agreement, because that's the basis of our involvement with Payton Lane. We have got a bond -- you know, bonds particularly company to do a certain contract, so the contract needs to be incorporated by reference.

Q: And what does "incorporated by reference" mean?

MR. RITTMASTER [Plaintiffs' attorney]: Objection to Form.

A: It means that -- well, it means the general conditions and specifications, plans, drawings, are all going to be part of this deal.

Q: And if we go to the next page, page 5, paragraph 3, it further describes Kemper's responsibilities and says "surety shall have all of the principal's rights and obligations and responsibilities as set forth in the contract."

MR. RITTMASTER: Objection to Form.

Q: Do you see that?

MR. RITTMASTER: The last sentence of paragraph 3.

Q: Yes, the last sentence

A: Okay, yes, I see that.

Q: Is that an accurate statement of your understanding of what Kemper's responsibilities were under the agreement?

A: Well, it may be different than what I believe our responsibilities were under the agreement, but we -- yeah, we are -- whatever that says, "shall have the principal's rights and obligations under the contract."

Q: I think you just testified that was different than your understanding. Is that what you said?

A: Well, no. We have the principal's rights and obligations under

the main contract.

Q:   Okay.

A: **And then basically as modified by what we are doing here, but that's this agreement, so that's the difference between our obligations under the agreement and our obligations under the contract or under that provision**.

Q: Where does it say that Kemper's obligations as set forth in the IDI contract as modified by this agreement?

A: It doesn't.  The agreement just changes what we are doing.

Angelillo Reply Aff., Ex. P, 78:5-80:14 (emphasis added).  Thus, although Everson stated that the agreement did not "say that Kemper's obligations as set forth in the IDI contract [are] as modified by this [Takeover] Agreement," he also testified that Plaintiffs' "rights and obligations and responsibilities as set forth in the [IDI] Contract" were "modified by what we are doing here [and] . . . that's the difference between our obligations under the agreement and our obligations under the contract or under that provision."  *Id.*, 80:4-14.

Likewise, in quoting Anastasio's deposition testimony, Payton Lane omits Anastasio's statement regarding his understanding that while the Takeover Agreement incorporated by reference the IDI Contract, the Takeover Agreement also modified the earlier agreement. Specifically, Anastasio testified that "the characterization and the representation of the Takeover Agreement and the RFP in Exhibit A modify [the IDI Agreement] to the extent that the parties agreed to put a line in the sand and move. . . ."[14]  Angelillo Aff., Ex. Q, 89:22-25.

---

[14]        The portion of Anastasio's deposition testimony provided by Payton Lane does not include the remainder of the quoted sentence.

The Court finds that, by its express terms, the Takeover Agreement limits the scope of the work to that which is specifically defined in it. For example, Paragraph 4 provides that the parties "agree that the remaining work as defined in Exhibit A will be performed in accordance with the terms of the [IDI] Contract and this Agreement. Exhibit B, attached, reflects the status of all change orders as of this date." *Id.* ¶ 4; *see also id.* ¶ 6 ("the Sureties shall complete the work required as set forth on Exhibit A pursuant to this Agreement on or before March, 15, 2009 . . . ."); ¶ 10 ("The parties agree that all claims for additional work in the change order log annexed as Exhibit B are consolidated into this Agreement."); ¶ 20 (quoted above); Ex. A ("The corrective work indicated on these documents and others attached herein must also be performed to complete all Work."). Likewise, the Court has already made reference to the language of Paragraph 3 of the Takeover Agreement which places an affirmative obligation on the Sureties to "cause the performance of the work as defined in Exhibit A . . . as the binding description of the work now remaining to be performed." *Id.*, ¶ 3. Similarly, by including specific items of corrective work and the NCWN Log, Exhibit A demonstrates the Takeover Agreement's limitation in scope.

Moreover, several provisions of the Takeover Agreement reflect the parties' understanding that it was possible that additional work (*i.e.*, outside the defined scope of the Takeover Agreement, as set forth in Exhibits A and B), would be performed on the Project. For example, Paragraph 5 of the Takeover Agreement provides that the Contract Balance of $7,400,972.00[15] "may be increased or decreased, as set forth in Exhibit B and/or as a result of any

---

[15]     As noted above, the Contract Balance of $7,400,972.00 is the authorized amount of the Contract, including all approved change orders ($30,317,327.00) less the amount paid by Payton Lane to IDI ($22,916,355.00). *See* Takeover Agreement (Schatz Aff., Ex. 1), ¶ 5(a)-(d).

subsequent change orders for extra work -- *i.e.*, work that is different from, in excess of or beyond the scope of the work required by this Agreement -- requested or required after the date of the execution of this Agreement . . . ." *Id.*, ¶ 5(d). Paragraph 5 further provides that Payton Lane will make payments directly to Plaintiffs of "the Contract Balance, plus or minus any additional amounts of money on account of any change orders or modifications requested and authorized by Payton Lane . . . in accordance with the terms of the Contract as to the time, amount and method of payment and shall not be delayed or suspended." *Id.*, ¶ 5(g). Based upon these provisions, it is reasonable to conclude that the parties recognized the Contract Balance would change based upon the discovery of additional work which was not yet known about at the time of the execution of the Takeover Agreement, and which would nonetheless need to be performed. Thus, the Takeover Agreement modified the IDI Contract to the extent the Contract Balance would change, but such payment would still be made in accordance with the relevant provisions of the IDI Contract.

Additionally, under the Takeover Agreement, the parties agreed that "day-to-day construction issues with regard to the Project" would be resolved by Greyhawk (acting on Plaintiffs' behalf) and Payton Lane. *Id.* ¶ 13.[16] Specifically, Paragraph 13 of the Takeover Agreement authorizes Greyhawk (or another Authorized Representative of Plaintiffs) "to negotiate and sign change orders for extra work on behalf of the Sureties without the Sureties' prior written approval . . . ." *Id.* The Court notes that under Article 7 of the IDI Contract,

---

[16] To that end, the Takeover Agreement provides as follows: "GREYHAWK or such other Authorized Representative shall have the authority to deal with Payton Lane and its designated representatives for the purpose of resolving day-to-day construction issues with regard to the Project." *See* Takeover Agreement (Schatz Aff., Ex. 1), ¶ 13.

Change Orders were to be based upon agreement among Payton Lane, IDI and Perkins.  *See* IDI

Contract, ¶ 7.1.2.  Based upon these provisions, it is reasonable to conclude the parties

understood that following the execution of the Takeover Agreement, change orders would be

negotiated and resolved between the Sureties/Greyhawk and Payton Lane, without the

involvement of Perkins.

The Takeover Agreement's modification of the process for negotiating change orders is

further demonstrated by the fact that Payton Lane approved Greyhawk's Change Order Request

No. 35, for a double check valve in the Sewage Treatment Plant.  According to the Schatz

Affidavit, Greyhawk submitted COR 35 directly to Payton Lane.  In an email dated April 20,

2005, Payton Lane stated that it "authorizes Greyhawk to proceed with the work described on

Surety COR # 35 dated March 25, 2005 at a lump sum price of $3,654.00."  Schatz Aff., ¶ 19,

Ex. 11.  Likewise, a letter dated February 4, 2005 from Perkins to Greyhawk rejecting COR No.

2 similarly acknowledged that, under the Takeover Agreement, change orders would be handled

by Payton Lane and Plaintiffs.  That letter stated as follows:

> We interpret the Contract Documents to require the Surety, in the role
> of Contractor, to be responsible for the correction of nonconforming
> or damaged work as it is discovered or uncovered.  Should you take
> exception with this basic tenet, as you must given the recent barrage
> of Change Order Requests, this issue must be addressed immediately
> between the principals to the agreement.

Pls.' Mem. at 12; Schatz Aff. ¶ 19, Ex. 12.  The principals to the Agreement are the Sureties and

Payton Lane.  Thus, the Takeover Agreement modified the procedure for submitting Change

Orders to the extent that such Change Orders were now to be negotiated between and signed by

Greyhawk (on the Sureties' behalf) and Payton Lane and, pursuant to Paragraph 5(g) (discussed above), payment would be made by Payton Lane directly to the Sureties.

In sum, the Takeover Agreement limits the scope of the work to be performed by Plaintiffs on the Project to that work which is defined in the Agreement. Moreover, the terms of the Takeover Agreement demonstrate the parties' understanding that it was possible that additional work -- outside the defined scope of the agreement -- would be performed on the Project. However, based upon the current record, Payton Lane has not met its burden to show that the work set forth in the five CORs was within the scope of the Takeover Agreement. The Court concludes that there are genuine issues of material fact whether the work performed pursuant to the CORs was within the scope of the Takeover Agreement. Thus, the Court turns to an analysis of whether the procedure for submitting the CORs is governed by Article 4 or Article 7 of the General Conditions of the IDI Contract.

## 2.    *Application Of Article 4 Of The IDI Contract*

In the event the Court were to find that the CORs at issue here are "Claims," as that term is defined by Article 4.3.1 of the Takeover Agreement, then the procedure for submitting such Claims would be governed by Article 4.3, which contains the 21-day notice requirement. Article 4.3.2 provides as follows:

> Claims . . . shall be referred initially to the Architect for action as provided in Paragraph 4.4. A decision by the Architect, as provided in Subparagraph 4.4.4, shall be required as a condition precedent to arbitration or litigation of a Claim between the Contractor and Owner as to all such matters arising prior to the date final payment is due regardless of (1) whether such matters relate to execution and progress of the Work or (2) the extent to which the work has been completed. The decision of the Architect in response to a Claim shall not be a condition precedent to arbitration or litigation in the event (1)

the position of the Architect is vacant, (2) the Architect has not received evidence or has failed to render a decision within agreed time limits, (3) the Architect has failed to take action required under Subparagraph 4.4.4 within 30 days after the Claim is made, (4) 45 days have passed after the Claim has been referred to the Architect or (5) the Claim relates to a mechanic's lien.

IDI Contract, ¶ 4.3.2. Section 4.3.3, entitled "Time Limits on Claims," provides as follows:

Claims by either party must be made within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be made by written notice. An additional claim made after the initial Claim has been implemented by Change Order will not be considered unless submitted in a timely manner.

IDI Contract, ¶ 4.3.3. Thus, the IDI Contract required a Claim to be submitted to Perkins by the later of "21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim," and a decision by Perkins on the Claim was a "condition precedent to arbitration or litigation of a Claim between the Contractor and Owner[.]" *Id.*, ¶¶ 4.3.2, 4.3.3.

Under New York law, courts regularly enforce notice requirements similar to the one described in Article 4.3.2 where the relevant provision explicitly states that notice of such a claim is a condition precedent to bringing such a claim, and Payton Lane relies upon cases holding the same. *See, e.g.*, *Kingsley Arms, Inc. v. Sano Rubin Const. Co., Inc.*, 16 A.D.3d 813, 814, 791 N.Y.S.2d 196 (N.Y. App. Div. 3d Dep't 2005) (analyzing similar notice provision and finding that since it was "clear that compliance with the notice provisions of this construction contract was a condition precedent to plaintiff's claim, [plaintiff's] failure to strictly comply is a waiver of

its claim");[17] *F. Garofalo Elec. Co., Inc. v. New York Univ.*, 270 A.D.2d 76, 80, 795 N.Y.S.2d

327 (N.Y. App. Div. 1st Dep't 2000) ("The contract's notice and documentation requirements for

extra work and delay damages are conditions precedent to plaintiff's recovery and the failure to

strictly comply is deemed a waiver of such claims."). Moreover, such rigid compliance with a

notice-of-claim provision may be strictly required regardless of whether the contract at issue is

one for a private or public construction project. *See Northgate Elec. Corp. v. Barr & Barr, Inc.*,

61 A.D.3d 467, 468-69, 877 N.Y.S. 2d 36, 37-38 (N.Y. App. Div. 1st Dep't 2009).

The Court notes, however, that the instant action is distinguishable in at least two respects

from the above-cited cases where courts found that compliance was strictly required. First, in

both *Kingsley Arms* and *F. Garofalo Electric*, the plaintiffs *admitted* that they had not complied

with the notice requirements. *See Kingsley Arms, Inc.,* 16 A.D.3d at 814, 791 N.Y.S.2d at 196;

*F. Garofalo Elec. Co., Inc.*, 270 A.D.2d at 78, 80, 795 N.Y.S.2d at 327 (further noting that

plaintiff's argument -- that it did not waive its claims because its agent orally abandoned, waived

and/or modified the notice requirement -- failed because the evidence, including the clear terms

of the contract, showed that plaintiff's agent "lacked authority to waive, modify the notice or

documentation requirements in plaintiff's contract"). In the instant case, the Sureties make no

such admission. To the contrary, Plaintiffs assert that, in the event the Court determines that

---

[17]     The court in *Kingsley Arms* also noted that on motions for summary judgment,
"plaintiff can be granted some leniency in its attempt to raise a triable issue of fact" as to whether
the notice requirement was waived as a result of the parties' conduct where it was alleged that the
moving party was aware of the underlying claims. In that case, however, the court found that
plaintiff's proffer, consisting of a two-page affidavit "which alleged that conversations occurred
with defendant 'during the Fall of 2000' regarding plaintiff's inability to complete its work due
to the failure of other contractors to first complete their portion of the work" "was simply
insufficient." *Kingsley Arms*, 16 A.D.3d at 815, 791 N.Y.S.2d at 196.

Article 4 applies to the CORs, the communications between the parties which occurred prior to submission of the CORs, including discussions at the project meetings, the meeting minutes, critical items lists, and various emails, served to timely initiate such claims. *See* Pls.' Mem. at 16; Schatz Aff., Exs. 2-7.

Second, where courts require strict compliance with notice provisions, such provisions typically contain a statement "setting forth the consequences of a failure to strictly comply." *See Northgate Elec. Corp.*, 61 A.D.3d at 468-69, 877 N.Y.S. 2d at 37-38 ("notice clause provides that '[i]n default of such notice the claim is waived'") (citing *Promo-Pro Ltd. v. Lehrer McGovern Bovis*, 306 A.D.2d 221, 222, 761 N.Y.S.2d 655, 656 (N.Y. App. Div. 1st Dep't (2003)); *A.H.A. Gen. Constr. v. New York City Hous. Auth.*, 92 N.Y.2d 20, 677 N.Y.S.2d 9 (N.Y. 1998) (notice clause contained conditional "unless" language)); *see also Morelli Masons, Inc. v. Peter Scalamandre & Sons, Inc.*, 294 A.D.2d 113, 742 N.Y.S.2d 6 (N.Y. App. Div. 1st Dep't 2002) (notice clause "specifically provided that the failure to comply with such provision would constitute a waiver of the subcontractor's claim for damages"); *but see Barsotti's, Inc. v. Consol. Edison Co. of New York, Inc.*, 254 A.D.2d 211, 212, 680 N.Y.S.2d 88 (N.Y. App. Div. 1st Dep't 1998) (affirming denial of summary judgment where court found issue of fact as to whether defendant waived notice requirement where notice clause did not contain a condition precedent and did not set forth the consequences of failure to strictly comply). The notice provision at issue here, as it is set forth in Articles 4.3.2 and 4.3.3 of the IDI Contract, does not contain a statement setting forth the consequences of a party's failure to provide 21 days notice of a Claim. Thus, the notice provision at issue here falls along the continuum of cases dealing with notice issues somewhere between the clauses considered in *Northgate Electric Company*, on the one hand, and

30

the clauses considered in the *Barsotti's* case and relied upon by Payton Lane (*see* Def.'s Mem. at 6-7), on the other. *See Northgate Elec. Corp.*, 61 A.D.3d at 468-69, 877 N.Y.S. 2d at 37-38 (criticizing the lower court's reliance on *Barsotti's* "in finding an issue of fact as to whether defendant had waived the subcontract's requirement that plaintiff give it written notice of 'a claim of any nature whatsoever against [it]' within 15 days 'of the occurrence of the event or documentation upon which such claim is based'" because "*Barsotti's* did not involve a condition precedent-type notice provision setting forth the consequences of a failure to strictly comply").

Based upon the foregoing analysis, the Court finds that Payton Lane has not met its burden to show that the five CORs at issue here are "Claims." Based upon the current record, there are genuine issues of material fact whether the CORs constitute Claims and whether the procedure for submitting and determining such Claims is governed by Article 4 of the IDI Contract.

### 3. Application Of Article 7 Of The IDI Contract

If the work described in the five CORs pertained to "day-to-day construction issues concerning the Project," then under Paragraph 13 of the Takeover Agreement, such work was to be negotiated between and signed by Greyhawk (on Plaintiffs' behalf) and Payton Lane in the form of Change Orders. Moreover, such Change Orders would be governed by Article 7 of the IDI Contract, which does not contain any notice requirement. Specifically, Article 7.2.1, entitled "Change Orders," provides as follows:

> A Change Order is a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect, stating their agreement upon all of the following:
> (1) a change in the work;
> (2) the amount of the adjustment in the Contract Sum, if any; and

(3) the extent of the adjustment in the Contract Time, if any.

Takeover Agreement (Schatz Aff., Ex. 1), ¶ 7.2.1.

The Change Order Requests (CORs) at issue here are in the form of letters from Salvatore Federico of Greyhawk (acting on Plaintiffs' behalf), to Sam Klein of Payton Lane. *See* Angelillo Aff., Exs. F (COR #8), I (COR # 11), K (COR #14), M (COR #19), N (COR #27). Each COR contains five subparts: (1) the estimated cost "for defective work outside the scope of work per the Takeover Agreement;" (2) a description of the corrective work to be performed; (3) a breakdown of the estimated cost; (4) the statement that "**[t]his Change Order will extend the project completion by:** a period To Be Determined[;]" (emphasis in original); and (5) the following statements:

> Unfortunately, the nature of the defective work and the difficulty in assessing the remedy, cost for the remedy and the time to implement the remedy cannot always be readily determined. Therefore, to expedite the process, the Surety has undertaken to identify such additional defective work to Payton Lane via this COR, which identifies the work, but reserves the submittal of cost and time considerations until a definitive scope, cost and time can be ascertained.

> This letter is written with a full and complete reservation of rights and defenses; nothing herein shall be deemed to be an estoppel, waiver, or modification of any of the Surety's rights or defenses, and the Surety hereby reserves all of its rights and defenses under any other agreements, contracts, bonds, or applicable law.

Angelillo Aff., Exs. F, I,[18] K, M, N.

---

[18] COR # 11 (Angelillo Aff., Ex. I) does not contain the first paragraph regarding the reservation of rights as to the later submission of definitive cost and time considerations.

At the outset, the Court notes that the CORs contain the three items of information required by Article 7.2.1.[19] Nonetheless, Defendant argues that these CORs do not constitute "Change Orders" as that term is defined in Paragraph 7.2.1. Def.'s Reply Mem. at 9 n. 1 (citing Angelillo Reply Aff., Ex. 22, ¶ 7.2.1). Although the Court recognizes that the CORs here are not prepared by Perkins (the Architect) or signed by Perkins or Payton Lane, such circumstances do not necessarily preclude application of Article 7 for at least two reasons. First, the CORs at issue here are *requests* for change orders made by Greyhawk (on Plaintiffs' behalf) and submitted to Payton Lane, not the actual change orders themselves. Second, as noted previously, Article 13 of the Takeover Agreement modified Article 7 to the extent that change orders were to be negotiated between and signed by Greyhawk and Payton Lane only. Thus, Article 13 appears to have eliminated the need for Perkins' involvement in the Change Order process.[20] Moreover, according to the Schatz Affidavit, prior to performing the work, Greyhawk submitted preliminary CORs which contained estimated costs. Schatz Aff., ¶ 5. The work was then performed on a time and material basis because, due to various uncertainties regarding the amount of time and material necessary to complete the work, among other things, it was not practical to obtain a lump sum price prior to completion. *Id.* Subsequently, after Howell performed the work and

_____

[19] The format and type of information included in COR #35 (Schatz Aff., Ex. 11) which was approved by Payton Lane (discussed above), is identical to that of CORs 8, 11, 14, 19 and 27.

[20] The Takeover Agreement's modification of the CORs submission process in this respect is reflected in a February 4, 2005 letter from Perkins to Plaintiffs (Schatz Aff., Ex. 12), in which Perkins stated that the issue of which party was responsible for the correction of nonconforming work as it is discovered or uncovered "must be addressed immediately between the principals to the agreement[,]" *i.e.*, Payton Lane and the Sureties. *See* Schatz Aff., ¶ 19, Ex. 12.

Greyhawk obtained the final costs (or a more accurate assessment of the costs), Greyhawk would submit to Payton Lane formal CORs for the work.  *Id*.  Defendant has not submitted any evidence to refute Schatz's narrative regarding the process by which CORs were submitted. Therefore, viewing the evidence in the light most favorable to the non-moving party for purposes of this motion, the Court credits Schatz's sworn statements.

### 4.    *Existence of Genuine Issues of Material Fact*

When the evidence and all factual inferences arising from that evidence are viewed in the light most favorable to Plaintiffs, the record before this Court -- including the briefs, affidavits, exhibits, deposition testimony and oral arguments -- supports a finding that Payton Lane has not met its burden to show Plaintiffs' purported obligation to provide written notice of the work set forth in the CORs within 21 days of discovery of such conditions, or Plaintiffs' alleged failure to do so.  Thus, Payton Lane's assertions, that Plaintiffs were required to adhere to the 21-day notice provision or that as a result of such failure to provide notice, Plaintiffs' claims for damages under CORs 8, 11, 14, 19 and 27 should be dismissed, must await trial.

In addition to the arguments analyzed above, Plaintiffs made three other assertions in opposition to Defendant's motion, namely, that (1) even if Article 4 were to apply to the CORs at issue, Payton Lane waived the notice requirement by its course of conduct; (2) Payton Lane acknowledged liability for the CORs by including them in submissions to the New York DOH; and (3) Payton Lane waived any failure to meet a condition precedent by not pleading that contention as an affirmative defense or otherwise by denying the performance of such condition precedent with particularity in the Answer, as required by Rule 9(c).  However, in light of the Court's finding that there are genuine issues of material fact whether the work performed by

34

Plaintiffs under the CORs was within the scope of the Takeover Agreement, as well as the applicability of Article 4 versus Article 7 of the IDI Contract to the CORs at issue, it is unnecessary for the Court to address these additional arguments.

**IV.**     CONCLUSION

For all of the foregoing analysis, the Court concludes that there exist genuine issues of material fact as to (1) whether the work performed pursuant to the five CORs at issue here fell within the scope of the Takeover Agreement, and (2) whether the process for submitting such CORs is properly governed by Article 4 or Article 7 of the General Conditions of the IDI Contract.  Accordingly, Defendant's motion for partial summary judgment is DENIED.


**SO ORDERED.**

Dated:  Central Islip, New York
         January 11, 2010


                                        /s/ A. Kathleen Tomlinson
                                        A. KATHLEEN TOMLINSON
                                        U.S. Magistrate Judge