**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY and AMERICAN
MOTORISTS INSURANCE COMPANY,

                    Plaintiffs,

        - against -

PAYTON LANE NURSING HOME, INC.,
PERKINS EASTMAN ARCHITECTS, P.C. and
LINCOLN GENERAL INSURANCE COMPANY,

                    Defendants.
------------------------------------------------------------------X

                                     **MEMORANDUM**
                                     **AND ORDER**
                                  CV 05-5155 (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

**I.**    <u>P<small>RELIMINARY</small> S<small>TATEMENT</small></u>

      This decision concerns the second of three summary judgment motions filed in this action, namely, Plaintiffs' Motion for Partial Summary Judgment [DE 162] seeking dismissal of Defendant's second counterclaim for liquidated damages in the amount of $3,816,123.00. The parties' dispute arises out of the construction of a 280-bed nursing home in Southampton, New York.

      In support of their motion, Plaintiffs American Manufacturers Mutual Insurance Company and American Motorists Insurance Company ("Plaintiffs" or "Sureties") rely upon their Local Rule 56.1 Statement of Undisputed Facts ("Pls.' 56.1 Stmt.") [DE 162-1]; Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pls.' Mem.") [DE 162-23]; and the Affidavit of Eric Schatz ("Schatz Aff.") [DE 162-2], to which numerous exhibits are annexed [DE 162, Exs. 1-20]. Plaintiffs also submitted a Reply Memorandum of Law in Further Support of the Motion for Partial Summary Judgment ("Pls.'

Reply Mem.") [DE 165-3], and the Reply Affidavit of Steven Rittmaster ("Rittmaster Reply Aff.") [DE 165], to which additional exhibits are annexed [DE 165, Exs. 1-2].

In opposition to the motion, Defendant Payton Lane Nursing Home, Inc. ("Payton Lane") relies upon its Responses to Plaintiffs' Rule 56.1 Statement (¶¶ 1-34) and Defendant's Counterstatement of Material Facts (¶¶ 35-66) ("Def.'s 56.1 Counterst.") [DE 163]; Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Def.'s Mem.") [DE 164]; and the Affirmation of Robert C. Angelillo ("Angelillo Aff.") [DE 163-1], with exhibits annexed [DE 163, Exs. A-O]. The Court has considered all of the submissions, the applicable case law, and the positions asserted by counsel during oral argument on the motion. For the reasons set forth below, Plaintiffs' Motion for Partial Summary Judgment is DENIED.

## II. STATEMENT OF FACTS

### A. Undisputed Facts

The following facts are drawn primarily from the pleadings and the parties' Rule 56.1 Statements where those facts are not disputed. On considering a motion for partial summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Capobianco v. New York*, 422 F.3d 47, 50 (2d Cir. 2001).

#### 1. IDI Contract

On or about November 16, 2001, IDI Construction Company, Inc. ("IDI"), the original contractor, and Payton Lane, as owner, entered into a construction contract dated November 16, 2001 (the "IDI Contract"), to build the Payton Lane Nursing Home in Southampton, New York (the "Project") for the sum of $29,717,385.00. Pls.' 56.1 Stmt., ¶ 4; Schatz Aff., ¶ 3 and Ex. 5; Def.'s 56.1 Counterst., ¶ 4. The IDI Contract was executed, at least in part, on HUD's form

92442. *Id.*[1]

Regarding the completion date of the Project, Article 2 of the General Conditions of the

IDI Contract provides as follows:

> The work to be performed under this Contract shall be commenced within 20 days and shall be completed by April 20, 2003. This time by which the work shall be completed may be extended in accordance with the terms of the said AIA General Conditions only with the prior written approval of the Commissioner.

Schatz Aff., Ex. 5, ¶ 3(A). In addition, with respect to Payton Lane's entitlement to liquidated

damages as a result of delay, the IDI Contract provides that

> if the work is not brought to final completion in accordance with the Drawings and Specifications, including any authorized changes, by the date specified above, or by such date to which the contract time may be extended, the contract sum stated in Article 3A below shall be reduced by $11,257, as liquidated damages, for each day of delay until the date of final completion. When the Owner cost certifies to HUD, the actual cost of interest, taxes, insurance, mortgage insurance premiums, and construction and permanent loan extension fees, as approved by the Commissioner, for the period from the scheduled date of completion through the date construction was actually completed, shall be determined. The lesser of the liquidated or actual damages shall be applied. The applicable amount shall be reduced by the project's net operation income (as determined by the Commissioner) for the damage period.[2]

---

[1] HUD form 92442, entitled "Construction Contract Lump Sum," is the standard form used for lump sum construction contracts between the construction company and the project owner. Here, Payton Lane asserts that the document annexed as Exhibit 5 to the Schatz Affidavit (HUD form 92442) is not the complete copy of all of the documents which constitute the IDI Contract. Def.'s 56.1 Counterst., ¶ 4. Payton Lane contends that the entirety of the IDI Contract is the document annexed as Exhibit D to the Angelillo Affirmation. *Id.*, ¶ 7.

[2] Plaintiffs assert that during the course of discovery they have located three different versions of the IDI Contract, each of which sets forth a different amount in the liquidated damages provision. The first version, which was produced as Exhibit 5 to the Schatz Affidavit, provides for $11,257.00 per day in liquidated damages. The second version sets forth a liquidated damages amount of $10,166.00. The third version, which was found in Plaintiffs'

*Id.*, ¶ 3(C).

### 2. *Performance Bond and Mortgage*

On December 3, 2001, the Sureties issued a performance bond to IDI, for the benefit of

Payton Lane, the United States Department of Housing and Urban Development ("HUD"), and

PFC Corporation ("PFC" or the "Lender"), as obligees, in the amount of $29,717,385.00.

Pls.' 56.1 Stmt., ¶ 5; Schatz Aff., ¶¶ 4, 15 and Ex. 6[3]; Def.'s 56.1 Counterst., ¶ 5.  Then, on

December 13, 2001, PFC made a mortgage loan (the "Mortgage") to Payton Lane in the amount

of $37,523,000.00, which included an allocation of $29,717,385.00 to be paid to IDI in

accordance with the requirements set forth in the IDI Contract.  Pls.' 56.1 Stmt., ¶ 6; Schatz Aff.,

¶ 4, Ex. 7 (Building Loan Agreement and Mortgage); Def.'s 56.1 Counterst., ¶ 6.  HUD insured

the Mortgage.  Pls.' 56.1 Stmt., ¶ 6; Schatz Aff., ¶ 4, Ex. 8 (HUD Regulatory Agreement).

### 3. *Takeover Agreement*

On or about May 11, 2004, Payton Lane terminated the IDI Contract and called upon the

Sureties to satisfy their obligations under their performance bond.  Pls.' 56.1 Stmt., ¶ 8; Schatz

Aff., ¶ 7 and Ex. 1; Am. Compl. [DE 37], ¶ 13; Def.'s 56.1 Counterst., ¶ 8.  Then, on July 9,

2004, the Sureties and Payton Lane entered into a Takeover Agreement.  Pls.' 56.1 Stmt., ¶ 9;

---

underwriting file, does not contain a stipulated sum for liquidated damages (the space is blank).
Schatz Aff., ¶ 6.  However, this discrepancy need not be resolved here because Plaintiffs agree
to assume as true, for purposes of this motion only, Payton Lane's contention that $11,257.00 per
day is the amount of liquidated damages in the IDI Contract.  *Id.*

[3]     Plaintiffs note that as part of the HUD program under which the Project was built,
IDI was required to "provide the surety bond, in a form dictated by HUD (FHA form 2452), to
guarantee its performance obligations for HUD's direct benefit, specifically naming HUD, in
addition to the owner and lender, as an 'obligee' on the bond."  Schatz Aff., ¶ 15 and Ex. 6.

Schatz Aff., ¶ 7 and Ex. 4; Def.'s 56.1 Counterst., ¶ 9. The Takeover Agreement provided that

the "Sureties shall complete the work required as set forth on Exhibit A pursuant to this

Agreement on or before March 15, 2005 (the "Revised Completion Date").[4] Schatz Aff., Ex. 4, ¶

6. Pursuant to Paragraph 7 of the Takeover Agreement, the Sureties paid $4.25 million to Payton

Lane

> for damages suffered by and dispute related expenses incurred by
> Payton Lane, in consideration for an assignment of all claims Payton
> Lane has against Sureties under the Bonds for damages of any kind,
> except for claims relating to latent construction defects, if any, from
> the commencement of the Project up to and existing as of the date of
> the execution of this Agreement (the "Pre-Takeover Claim") . . . .

Schatz Aff. Ex. 4, ¶ 7.[5] The Takeover Agreement further provided that Greyhawk would

continue as the Sureties' "Authorized Representative with regard to completion of the remaining

work" on the Project, and would "supervise the work to be performed by the Completion

Contractor." Schatz Aff., Ex. 4, ¶ 12.

### 4. Discovery of Non-Conforming Work

Following the execution of the Takeover Agreement, Plaintiffs hired E.W. Howell

---

[4]     Plaintiffs assert that under Paragraph 6 of the Takeover Agreement, they "agreed to perform a defined and limited scope of completion work." Pls.' 56.1 Stmt., ¶ 10; Schatz Aff., ¶ 7. Defendant, on the other hand "disputes plaintiffs' allegation that plaintiffs agreed to perform a 'defined and limited scope of completion work' to the extent that phrase means anything other than completion of the Project." Def.'s 56.1 Counterst., ¶ 10. The scope of the Takeover Agreement (*i.e.*, the scope of the work Plaintiffs were required to perform under the Takeover Agreement) is a central issue in this litigation, but need not be decided here.

[5]     Plaintiffs contend that the $4.25 million payment to Payton Lane was "to resolve all of Payton Lane's claims up to the date of the execution of the Takeover Agreement." Pls.' 56.1 Stmt., ¶ 10; Schatz Aff., ¶ 7. Defendant objects to this statement and refers the Court to the Takeover Agreement itself. Def.'s 56.1 Counterst., ¶ 10. Accordingly, the Court has recited the relevant provision above.

Construction Company, Inc. ("Howell") to complete the work required under the Takeover Agreement. Pls.' 56.1 Stmt., ¶ 11; Schatz Aff., ¶ 8; Def.'s 56.1 Counterst., ¶ 11. After commencing work on the Project, Howell discovered and informed Plaintiffs of certain items of work which were not properly completed by IDI (the "non-conforming work"). *Id.* Plaintiffs paid more than $2 million to Howell to perform the corrective work (*i.e.*, the work needed to fix the non-conforming work done by IDI). Pls.' 56.1 Stmt., ¶ 12[6]; Schatz Aff., ¶ 9.

Although the Revised Completion Date as set forth in the Takeover Agreement was March 15, 2005, Payton Lane did not obtain a certificate of occupancy until February 17, 2006. Def.'s Am. Answer & Countercls. ("Am. Answer.") [DE 58], ¶¶ 184, 186. In its Second Counterclaim for delay damages (which is the subject of Plaintiffs' motion here and which is discussed further below), Payton Lane alleges that, under the Takeover Agreement, it is entitled for delay damages for the period from March 15, 2005 through February 17, 2006. *Id.*, ¶ 185.

The Sureties, on the other hand, assert they "had achieved substantial completion of the work they were required to perform by August 12, 2005, . . . were entitled to an extension of at least 180 days, and that they are not responsible for any delays after August 12, 2005." Schatz Aff., ¶ 10. In support of this position, the Sureties allege, *inter alia*, that Howell's "correction of non-conforming work, together with Payton Lane's failure to provide direction when issues arose with the work, caused substantial delays to the Project." *Id.*, ¶ 9. The Sureties further contend

---

[6] Payton Lane states that it "has no basis to contest" Plaintiffs' allegation that "plaintiffs paid Howell more than $2 million to complete the alleged non-conforming work." However, Payton Lane "disputes that it has any obligation to pay plaintiffs for this work to the extent that it was within the scope of work of the fixed-price Takeover Agreement . . . ." Def.'s 56.1 Counterst., ¶ 12. Plaintiffs' entitlement to the money paid to Howell for non-conforming work was the subject of the Defendant's motion for partial summary judgment, which was denied by separate Order on January 11, 2010 [DE 202] and need not be addressed here.

that, in any event, the "Court need not determine the actual date of substantial completion on this motion as, regardless of the completion date, Payton Lane is barred from recovery of liquidated damages, based on its certification to HUD and its representations to the [IRS] in its 2006 tax return." *Id*., ¶ 12.

### 5. *HUD's Section 232 Program*

The Payton Lane Nursing Home was built pursuant to Section 232 of the National Housing Act (the "Section 232 Program"), which was passed by Congress "to assist in the provision of facilities for [*inter alia*] . . . [t]he development of assisted living facilities for the care of frail elderly persons." 12 U.S.C. § 1715w(a)(3). The Section 232 Program is further intended "to insure mortgages made by private lending institutions[, which] are used to finance construction or renovation of nursing homes, and assisted living and rest homes for the elderly." HUD Audit Case No. 2002-KC-2, Nationwide Survey of HUD's Office of Housing § 232 Nursing Home Program (Schatz Aff., Ex. 9); *see also* 12 U.S.C. § 1715w(d) (authorizing the HUD Secretary "to insure any mortgage which covers a new or rehabilitated nursing home, assisted living facility, or intermediate care facility . . ." subject to certain conditions, including that the "mortgage shall be executed by a mortgagor approved by the Secretary . . . ."). Under Section 232, HUD will insure a non-recourse mortgage loan (*i.e.*, the personal assets of the owner are not at risk in the event of a mortgage loan default (with certain exceptions not applicable here)) (Schatz Aff., ¶ 14 and Ex. 8, ¶ 17), for up to 90% of the cost of the Project (so that the mortgagor is required to put up only 10% of the equity). 12 U.S.C. § 1715w(d)(2). Schatz Aff., ¶ 14. For the Payton Lane Nursing Home, HUD approved the original mortgage commitment of $39,708,951. Pls.' 56.1 Stmt., ¶ 26; Schatz Aff., ¶ 24 and Exs. 14-15.

### 6. *Defendant's Counterclaim*

After the Sureties commenced this action, Payton Lane filed its Answer with Crossclaims against co-Defendant Perkins Eastman Architects, P.C. ("Perkins") and Counterclaims against the Sureties.[7] Payton Lane's second counterclaim is for liquidated damages stemming from the Sureties' purported failure to complete the Project by the agreed-upon date (the "Second Counterclaim"). Am. Answer, ¶¶ 182-187; Pls.' 56.1 Stmt., ¶ 13; Def.'s 56.1 Counterst., ¶ 13. Specifically, Payton Lane alleges that (1) the Sureties, acting in concert with Greyhawk and Howell, "delayed the performance of, or refused to perform, the work necessary to complete the Project . . . ."; (2) the Sureties agreed to complete the Project by March 15, 2005; and (3) when the Project "was not brought to final completion in accordance with the Drawings and Specifications (as defined in the [IDI] Contract) by March 15, 2005, Payton Lane became entitled to liquidated damages in the amount of $11,257.00 per day. Am. Answer, ¶¶ 182-185. Payton Lane further alleges that the Sureties "never performed the work that was required to bring the Project to completion[,]" and so it "was forced to hire its own contractor to complete the Project." *Id*., ¶ 186. According to Payton Lane, the Project was completed on February 17, 2006, thereby entitling Payton Lane to liquidated damages in the amount of $3,816,123.00 (for a total of 339 days). *Id*.

Thereafter, Plaintiffs retained a scheduling expert, Donald Lefler, who issued a report dated March 9, 2009 concerning, *inter alia*, Payton Lane's allegations as to Plaintiffs' liability for

---

[7] Payton Lane's original pleading was amended on November 14, 2007. *See* DE 58. All subsequent references to Payton Lane's pleading are to the Amended Answer with Cross-Claims and Counterclaims.

delay damages.  Pls.' 56.1 Stmt., ¶ 14; Schatz Aff., ¶ 10.[8]

## III.  THE PARTIES' CONTENTIONS

### A.  The Sureties' Position

The Sureties move for partial summary judgment seeking to dismiss Payton Lane's Second Counterclaim for liquidated damages for the Sureties' alleged delays in completing the Project.  The Sureties argue that Defendant is estopped from seeking liquidated damages in this action because Payton Lane's previous financial representations to the Internal Revenue Service (the "IRS") and to HUD regarding the Project did not include the approximately $3.5 million which Payton Lane is now claiming in liquidated damages.  Specifically, Plaintiffs allege that in its 2006 tax returns, Payton Lane represented that it owed $3,910,913.00 in current liabilities -- and this amount did not include Payton Lane's claim for $3.5 million in liquidated damages.  The Sureties also maintain that in the Certificate of Actual Cost submitted to HUD, Payton Lane represented that $3,910,913.00 was the full retainage to be paid to the Sureties, and this amount did not include the claim for liquidated damages.  According to Plaintiffs, because (1) Payton Lane made these quasi-judicial representations which did not include the liquidated damages claim, and (2) Payton Lane incurred benefits as a result of such representations, then Payton Lane

_____

[8]     Plaintiffs maintain that Lefler's expert report "confirm[ed], *inter alia*, that the Sureties had achieved substantial completion of the work they were required to perform by August 12, 2005, that the Sureties were entitled to an extension of at least 180 days, and that the Sureties are not responsible for any delays after August 12, 2005." Pls.' 56.1 Stmt., ¶ 14; Schatz Aff., ¶ 10.  Payton Lane argues that Lefler's report did not "confirm[] anything insofar as, *inter alia*, it is premised upon an incorrect interpretation of the Takeover Agreement that Mr. Lefler was not qualified to make in any event." Def.'s 56.1 Counterst., ¶ 14.  The Court notes that the subject of Lefler's report -- Payton Lane's entitlement to liquidated damages for delays -- is the central issue in this motion.  Neither party provided a copy of the Leffler report.

9

should not now be permitted to assert its liquidated damages claim in contravention of these prior representations.

### 1. Payton Lane's 2006 Tax Returns

The Sureties assert that in its 2006 Federal Income Tax Return, Payton Lane represented that it owed $3,910,913.00 to the Sureties, and that this amount did not include any offset or deduction for liquidated damages. Pls.' Mem. at 10. Specifically, Plaintiffs contend that in Schedule L, Statement 7 of Payton Lane's 2006 Federal Income Tax Return (Schatz Aff., Ex. 18 at 15), Payton Lane represented that $3,910,913.00 was owed to the Sureties as "OTHER CURRENT LIABILITIES." Pls.' 56.1 Stmt., ¶ 32; Schatz Aff., ¶ 27 and Ex. 18 at 15. Plaintiffs state that the $3,910,913.00 consists of two components. The first is the "RETAINAGE PAYABLE" of $2,948,306.00, which is set forth in the first line of Schedule L, Statement 7 of Payton Lane's 2006 tax return. Pls.' 56.1 Stmt., ¶ 33; Schatz Aff., ¶ 27 and Ex. 18 at 15. The second component is $962,602.00 for certain of the Sureties' change orders, which, according to the Sureties, is part of the $1,508,537.00 reported as "ACCRUED ITEMS PAYABLE" in the third line of Schedule L, Statement 7. *Id.* Plaintiffs point to the "Schedule of Accrued Construction Costs Payable As of March 2, 2006" (Schatz Aff., Ex. 19), which was produced by Payton Lane's accountants, and which shows that "Disputed Surety Change Orders" of $962,607.00 is one component of the $1,508,537.00 in "Total Accrued Items Payable" which appears in Schedule L of Payton Lane's tax return. Pls.' 56.1 Stmt., ¶ 33; Schatz Aff., ¶ 27 and Exs. 18, 19.

Plaintiffs contend that Payton Lane received a benefit from reporting $3,910,913.00 as a "current liability." Specifically, according to Plaintiffs, reporting $3,910,913.00 as a liability

increased the amount of depreciation claimed by Payton Lane, which ultimately resulted in a net

loss for 2006 of approximately $ 3.2 million.  Pls.' Reply Mem. at 6, 8.

In sum, the Sureties assert it is undisputed that Payton Lane represented on its 2006 tax

return that it owed $3,910,913.00 to the Sureties, and that amount did not include an offset for

liquidated damages.  Pls.' Mem. at 7, 10.  As a result of such representation to the IRS, from

which Payton Lane benefitted in the form of a tax deduction, the Sureties argue that Payton Lane

is estopped from now asserting its claim for liquidated damages against them.  Pls.' Reply Mem.

at 6.

### 2.    Payton Lane's Certificate of Actual Cost

Under Section 232 of the National Housing Act, following completion of the Project, in

May 2006, Payton Lane submitted to HUD form 92330, entitled "Certificate of Actual Cost."

Schatz Aff., ¶ 19 and Ex. 10[9]; Pls.' Mem. at 5.  Plaintiffs point to Article 2(C) of the IDI

Contract, the provision governing liquidated damages, which provides, in part, as follows:

> When the Owner cost certifies to HUD, the actual cost of interest,
> taxes, insurance, mortgage insurance premiums, and construction and
> permanent loan extension fees, as approved by the Commission, for
> the period from the scheduled date of completion through the date
> construction w as actually completed, shall be determined.  The lesser
> of the liquidated or actual damages shall be applied.  The applicable
> amount shall be reduced by the project's net operating income (as
> determined by the Commissioner) for the damage period.

Schatz Aff. Ex. 5, Art. 2(C).  Plaintiffs maintain that under this provision, "the owner/mortgagor

---

[9]       During the course of discovery in this case, Greyhawk obtained a copy of Payton
Lane's Certificate of Actual Costs from HUD pursuant to a FOIA request dated March 7, 2008.
Schatz Aff., ¶ 19.  Greyhawk's FOIA request sought, among other things "[a]ll documents
relating to Payton Lane Nursing Home Inc.'s possible claim or assessment of liquidated damages
against the Contractor[,]" and is annexed as Exhibit 12 to the Schatz Affidavit.  *Id.*, ¶¶ 19, 21.

[Payton Lane] claims, and the HUD Commissioner determines, the applicable damages for the delay period, applying the lesser of the two in reduction of the owner's actual cost of construction." Pls.' Mem. at 13. Further, according to Plaintiffs, "this provision makes it clear that liquidated damages, if any, reduce the amount of the 'contract sum,' i.e., the amount of the loan insured by HUD. This inures to HUD's benefit as the mortgage it has insured will be decreased thereby reducing its potential exposure if there is a default. The provision does not, as Payton Lane appears to believe, allow Payton Lane to collect liquidated damages from the Sureties." Id.

Line 1a on the Certificate of Actual Cost calls for the "[a]mount due under terms of Lump Sum Construction Contract (as adjusted)." Schatz Aff., Ex. 10. Plaintiffs assert that a mortgagor/owner, such as Payton Lane, is required to account for liquidated damages, if any, in Line 1. Pls.' Mem. at 14. In support of this argument, Plaintiffs point to HUD's "Cost Certification Guide for Mortgagors and Contractors of HUD-Insured Multifamily Projects" (HUD Handbook No. 4470.2) (Schatz Aff., Ex. 11), which requires the owner in Line 1a to

> enter the actual amount of cash paid or to be paid by the mortgagor under the terms of the construction contract as adjusted upward or downward by the HUD estimated cumulative effect of approved construction change orders, **liquidated/actual damages**, or incentive payment, if applicable.

Pls.' Mem. at 14; Schatz Aff. ¶ 17 and Ex. 11, subpara. 402(A) (emphasis added).

In Line 1a of its Certificate of Actual Cost, Payton Lane entered a total of $31,990,523.00 (the "Line 1a Amount") -- representing that $28,079,610.00 had previously been "Paid in Cash"

(Column A) and $3,910,913.00[10] was due to "be paid in cash within 45 days after final endorsement" (Column B). Schatz Aff., ¶ 19 and Ex. 10; Pls.' Mem. at 5-6, 14. Plaintiffs assert that the $31,990,523.00 entered on Line 1a did not include Payton Lane's current claim for liquidated damages and this omission is reflected in the work papers of Payton Lane's outside auditor.[11] Pls.' Mem. at 14. Specifically, Plaintiffs maintain that the work papers show the $28,079.610.00 figure entered in Line 1a, Column A "include[s] additions to the IDI Contract for 'IDI Change Order,' Kemper - Change Orders,' and 'Bond Premium,' and a reduction for 'Kemper Insurance - Fire Refund.'" Schatz Aff., ¶ 20 and Ex. 13 (Auditor's document entitled "Reconcile to 1a of Page 2 of the Mortgagor's Certificate of Actual Costs" (referred to as "Line 1a Reconciliation")). Plaintiffs further contend that the $3,910,913.00 entered on Line 1a, Column B "included 'Kemper - Change Orders' and 'Construction -Retainer.'" *Id.* In other words, the Line 1a, Column B amount consists of the Sureties' full retainage of $2,948,306.00, plus additional Surety change orders of $962,607.00. Pls.' Mem. at 15. According to Plaintiffs, neither the amount entered in Column A or Column B of Line 1a includes an adjustment for liquidated damages. Schatz Aff., ¶ 20 and Ex. 13.

---

[10] The $3,910,913.00 consists of $2,948,306.00 in retainage owed to Plaintiffs and $962,607.00 of Plaintiffs' change order requests. Schatz Aff., ¶ 20; Pls.' Mem. at 14-15. Plaintiffs note that this amount did not include any assessment of liquidated damages. Pls.' Mem. at 14; Schatz Aff., ¶ 20 and Ex. 13.

[11] During the course of discovery, Plaintiffs served a subpoena on Payton Lane's outside auditor, Friedman, LLP, to obtain these work papers "[i]n order to confirm that Payton Lane did not include liquidated damages" in the amounts listed in Line 1A of the Certificate of Actual Cost submitted to HUD. Schatz Aff., ¶ 20.

### 3. *The HUD-Guaranteed Mortgage*

Plaintiffs assert that Payton Lane omitted its claimed liquidated damages from its Certificate of Actual Costs in order "to induce HUD to insure a mortgage" in a greater amount, thereby avoiding "having to infuse additional capital into the [P]roject." Pls.' Mem. at 9.

Pursuant to the Section 232 Program, where the mortgagor is a "for-profit entity," as Payton Lane is, the mortgage must be insured for the lesser of (1) 90% of the "Total Land and Improvements," as set forth on Line 6 of form HUD-92580 ("Maximum Insurable Mortgage"), or (2) the original mortgage amount. Schatz Aff., ¶¶ 14 (citing 12 U.S.C. § 1715w), 23. Here, 90% of the "Total Land Improvements" ($44,121,057.00),[12] is $39,708,951.00. Schatz Aff., ¶ 24 and Ex. 15 (Lines 6-7). The original mortgage amount was $37,523,000.00. Schatz Aff., ¶ 24 and Ex. 15 (Line 1). Thus, HUD accepted the original mortgage amount of $37,523,000.00 because it was less than 90% of the total land improvement cost ($39,708,951.00). Schatz Aff., ¶ 24 and Ex. 15 (Line 10).

However, Plaintiffs assert, if Payton Lane had included its now-claimed liquidated damages of $3.5 million in Line 1a, the "Total Land and Improvements" amount would have

---

[12]    The figure for "Total Land and Improvements" ($44,121,057.00) (Schatz Aff., Ex. 15, Line 6), is calculated by HUD as the sum of the "Recognized 'Actual Cost' of Improvements" ($40,371,057.00) (Line 4), and the value of the "Land (New Construction & Substantial Rehabilitation involving an Acquisition)" ($3,750,000.00) (Line 5). Schatz Aff., ¶ 24 and Ex. 15. Plaintiffs note that in the Certificate of Actual Cost, Payton Lane submitted $50,901,739.00 as the figure for total land improvement (to be used to calculate the Line 1a Amount). Schatz Aff., ¶ 24 and Exs. 10, 14, 15. However, in calculating Payton Lane's Maximum Insurable Mortgage (form 92589), HUD recognized only $40,371,057.00. Schatz Aff., ¶ 24 and Ex. 14, 15. In other words, HUD disallowed $10,530,682.00 of Payton Lane's claimed land improvement costs. *Id.*; Pls.' Mem. at 15.

been reduced to $40,621,057.00.[13]  Schatz Aff., ¶ 25; Pls.' Mem. at 16.  According to Plaintiffs, this reduced figure would have changed the calculation set forth above as follows:  (1)  90% of the Total Land and Improvements ($40,621,057.00) is $36,558,951.00, whereas (2) the original mortgage amount was $37,523,000.00.  *Id*.  Under this calculation, HUD would have supported a mortgage of only $36,558,951.00.  In other words, according to Plaintiffs, if Payton Lane had included the now-claimed liquidated damages of $3.5 million, the amount of "approved costs would have been reduced to $40,621,057 and, based upon HUD's formula, the maximum mortgage would have been only $36,558,951.  The result would have been to require a capital infusion from Payton Lane to allow it to pay down the $964,049 difference to lender PFC."  Pls.' Mem. at 16.  According to Plaintiffs, therefore, by omitting the liquidated damages from Line 1a on the Cost Certification form, Payton Lane was able to induce HUD to approve a higher mortgage amount.  Otherwise, HUD would have only guaranteed the mortgage for up to 90% of the Total Land and Improvements, thereby requiring Payton Lane to put up the remaining 10% of the equity (*i.e.*, pay the difference of $964,049 to the lender).  Schatz Aff., ¶ 25; Pls.' Mem. at 16.

In sum, Plaintiffs contend that Payton Lane benefitted as a result of the exclusion of the liquidated damages claim from the Line 1A amount because, had the Line 1A amount included the additional $3.5 million, then the total mortgage approved by HUD pursuant to the Cost Certification form would have been lower, as a result of which, Payton Lane would have been required to pay additional money to the Lender to make up for the shortfall.  *Id*.

---

[13]     $44,121,057.00 - $3,500,000.00 = $40,621,057.00.

#### 4.     *Plaintiffs' Additional Arguments*

In support of its position that Payton Lane omitted its liquidated damages claim

from the Line 1a Amount, Plaintiffs assert that on approximately March 7, 2008, Greyhawk

submitted to HUD a FOIA request which sought, among other things, "[a]ll documents relating

to Payton Lane Nursing Home Inc.'s possible claim or assessment of liquidated damages against

the Contractor."  Schatz Aff., ¶¶ 19, 21 and Ex. 12.  Plaintiffs contend that HUD did not produce

any such claim or assessment. *Id.*, ¶ 21.  However, HUD did provide its Cost Certification

Review Worksheet (Form No. 92331-A) ("HUD Cost Certification Review"), dated August 14,

2006, which, according to Plaintiffs, indicated "that HUD found that liquidated damages were

'not applicable.'" *Id.*, ¶ 21 and Ex. 14.

In further support of their argument that the Line 1a Amount did not include Payton

Lane's claim for liquidated damages, Plaintiffs maintain that upon receiving Payton Lane's

Certificate of Actual Costs, Jay Fass, a HUD Project Manager/Mortgage Credit Examiner, used

the data supplied by Payton Lane to prepare HUD's Cost Certificate Review.  Schatz Aff., ¶ 22.

The Cost Certificate Review (annexed as Exhibit 14 to the Schatz Affidavit), contains a cover

memorandum dated August 14, 2006, from Fass to his supervisors, in which Fass recommends

that HUD approve the original mortgage amount of $37,523,000.00.  Under cover of this

memorandum, Fass "[s]ubmitted for approval and final endorsement" the (1) Mortgage Credit

Staff (form HUD-92331-A), which shows, *inter alia*, Fass's calculation of the Total Land

Improvement Cost (discussed above); and (2) Maximum Insurable Mortgage (form HUD-

925689), which shows, *inter alia*, the calculation of the Maximum Mortgage Amount (discussed

above).  Schatz Aff., Ex. 14.  Plaintiffs point out that, in this Review, Fass noted that **"Incentive**

**and Liquidated Damages are both not applicable**" and that liquidated damages were "N/A."

Schatz Aff., ¶ 22 and Ex. 14; Pls. Mem. at 6 (emphasis in original).

Plaintiffs also draw attention to two letters written to HUD in 2007 by Sam Klein, the owner of Payton Lane, requesting a meeting with Deborah VanAmerongen, the Director of HUD's division of Multifamily Housing in the New York City region,[14] "to discuss the disallowance of $10,500,000 in project related costs and have these dollars reinstated."  Schatz Aff., Ex. 16.

Plaintiffs claim that even though they paid $4.25 million to Payton Lane in August 2004 (pursuant to the Takeover Agreement), Payton Lane "is severely undercapitalizaed and chronically unable to pay its bills."  Plaintiffs assert "[t]his may be attributable to the fact that Payton Lane transferred $3,600,000 to Sam Klein's solely owned 'holding company,' Agrippa, LLC, the day after receiving the Sureties' payment, as reflected on Payton Lane's 2004 General Ledger.  Schatz Aff., ¶ 26 and Ex. 17.

Ultimately, the Sureties argue it is undisputed that (1) Payton Lane certified to HUD that there were no liquidated damages, and (2) HUD found that liquidated damages are not applicable to the Project.  Thus, Plaintiffs contend, because Payton Lane's representations are "inconsistent" with its current claim for $3.5 million in liquidated damages, "Payton Lane should be estopped from claiming liquidated damages in this action."  Pls.' Mem. at 11.

---

[14]    Ms. VanAmerongen signed the Maximum Insurable Mortgage form (prepared by Jay Fass) approving HUD's Maximum Insurable Mortgage in the amount of $37,5233.00.  Schatz Aff., ¶ 25 n.1 and Ex. 14.

**B.    Defendant's Position**

In opposition, Payton Lane argues that there are issues of material fact as to

(1) Plaintiffs' failure to complete the Project by the revised completion date and (2) Plaintiffs'

claims for payment pursuant to more than 60 CORs, "which together seek an 'undetermined'

time extension for completion of the Project, and which, if granted in their entirety, would excuse

plaintiffs from paying any liquidated damages at all."  Def.'s Mem. at 2.  Payton Lane disputes

Plaintiffs' claim that "substantial completion" of the Project was achieved on August 12, 2005.

Rather, according to Payton Lane, the Sureties "failed to complete the . . . Project until 339 days

*after* the contractually-mandated completion date" (emphasis in original), and "the propriety of

plaintiffs' time extension requests and their delay claim, if any, is a factual issue in dispute in this

case that will require a trial to resolve."  Def.'s Mem. at 1, 7.  Moreover, Payton Lane argues that

its purported non-reporting of the "liquidated damages claim as a $3.5 million 'current asset' on

the 2006 Tax Return and as a fixed actual receivable on the Certificate Actual Cost" is not

inconsistent with its assertion of the liquidated damages in the instant case.  *Id*.  Rather, Payton

Lane "did not make any representation at all concerning this claim on either its 2006 Tax Return

or on the Certificate of Actual Cost."  Consequently, Payton Lane maintains, the Sureties have

failed to establish "a fundamental element of a quasi-estoppel claim."  *Id*.

### 1.    Payton Lane's 2006 Tax Returns

Payton Lane argues that it was not required to report its current liquidated damages claim

in its 2006 tax returns because in 2006 (and today), such claim was only a contingency, not a

current asset.  According to Defendant, under the applicable case law and accounting rules,

conditional payments, such as a claim for liquidated damages in an ongoing litigation, are not

18

reported as income (and thus, are not taxed) until the litigation has concluded and the right to receive such payment has "become unconditional and absolute." Def.'s Mem. at 14-15 (citation omitted). Thus, Payton Lane asserts, it "was entirely correct in *not* reporting the liquidated damages claim as a 'current asset,' because it is *not* a *'current* asset[,]" and the omission of the $3.5 million from its current assets on the 2006 tax return "does not constitute a 'representation' for purposes of an estoppel at all." *Id*. at 15. Payton Lane further claims it "has not obtained any benefit as a result of . . . the 2006 Tax Return." *Id*. at 17. Finally, according to Payton Lane, the Sureties' argument with respect to estoppel must fail because it leads to the "absurd result" of requiring the owner/developer of a HUD project to declare the claim as a "current asset on its tax returns in violation of generally accepted accounting principles and federal law. Def.'s Mem. at 20 n.2.

### 2. *Payton Lane's Certificate of Actual Cost*

In connection with its Certificate of Actual Cost filed with HUD, Payton Lane asserts that pursuant to HUD requirements and generally accepted accounting principles, it was obligated to report "only those costs that it properly considered its actual construction costs." Def.'s Mem. at 8. Thus, Payton Lane included in Line 1a only "the outstanding contract balance and certain change orders." *Id*. Payton Lane did not include "its potential liquidated damages (which had not yet been asserted)" or "plaintiffs' contingent claims against it -- including their claims of delay on Payton Lane's part -- which, at the time of filing, exceeded $17 million." *Id*.

In support of its argument, Payton Lane points to its Auditor's Report, which was submitted to HUD with the Certificate of Actual Cost, and in which "Payton Lane's auditor specifically advised HUD of the existence of this lawsuit, and that it included claims by plaintiffs

for, *inter alia*, delay, as a 'contingency.'" Def.'s Mem. at 8; Angelillo Aff., Ex. F (Auditor's Report) at 19.[15] Payton Lane further maintains its auditor had advised HUD that "the outcome of the lawsuit was 'uncertain' and that the Certificate of Actual Cost did not include any loss contingency resulting from the law suit." Def.'s Mem. at 9; Angelillo Aff., Ex. F at 19. In other words, "Payton Lane's auditors specifically notified HUD that the outcome of this lawsuit may materially affect values in the Certificate of Actual Cost." Def.'s Mem. at 9.

Moreover, Payton Lane notes that with regard to HUD's approval of the Certificate of Actual Cost, HUD stated "it would 'Finally Endorse' the loan in an amount 'not to exceed' $37,523,000." Def.'s Mem. at 9, 22; Schatz Aff., Ex. 15 at 1. However, "'Final Endorsement' is the process by which HUD authorizes the final disbursement of the remaining mortgage proceeds and certifies that the 'terms and conditions of the HUD [insurance] commitment have been met to the commissioner's satisfaction.'" Def.'s Mem. at 9; Angelillo Aff., Ex. M (24 C.F.R. § 200.100(b)). Additionally, in its approval, HUD "specifically noted that the end result might differ from the approved amount, and that the approved mortgage amount might be further reduced when actual costs were established." Def.'s Mem. at 9; Schatz Aff., Ex. 15 at 1; Angelillo Aff., Ex. G at 1. In light of this language, Payton Lane argues that, contrary to Plaintiffs' position, it has received the benefit of the full amount of the HUD-guaranteed mortgage because HUD has not authorized PFC to release $3,420,830.00 of the mortgage loan. Def.'s Mem. at 9; Angelillo Aff., Ex. K at 3. As a result, Payton Lane has only realized

---

[15] Payton Lane asserts that the document annexed as Exhibit N to the Angelillo Affirmation is the complete copy of its Auditor's Report, whereas the document annexed as Exhibit 10 to the Schatz Affidavit includes only a portion of the Auditor's Report, and which portion does not include this representation. Def.'s Mem. at 8.

$34,102,170.00 of the mortgage proceeds -- which is less than the $36,558,951.00 which Plaintiffs allege Payton Lane would have been entitled to if it had included its liquidated damages claim in the HUD Certificate of Actual costs. *Def.'s Mem.* at 18.

Payton Lane further asserts that Plaintiffs' position concerning estoppel must fail because it leads to an "absurd result." *Def.'s Mem.* at 20 n.2. According to Payton Lane, if, as the Sureties argue, an owner/developer of a HUD project (such as Payton Lane) is "required to include the maximum *potential* liquidated damages *claim* in its Cost Certification, even though the liability for an actual amount of those contingent damages ha[s] not yet been established, such owner/developer has only two choices to deal with a defaulting contractor's failure to perform: (1) declare the entire *potential* liquidated damages claim in [its] cost certification to HUD (with no guarantee that it will be ultimately approved by a court, or . . . collected by the owner), which has the effect of potentially reducing the mortgage proceeds; or (2) waive the right to claim liquidated damages altogether in order to secure the maximum insurable mortgage." *Id*. Defendant contends that under this theory, either way, "the owner is forced to damage itself by either waiving a legitimate claim in court or reducing its maximum, insurable mortgage before securing entitlement to any liquidated damages." *Id*.

### 3. *Payton Lane Has Not Incurred Any Benefit*

In opposition to Plaintiffs' arguments for estoppel, Payton Lane argues that it has not benefitted as a result of the Certificate of Actual Cost submitted to HUD, and thus Plaintiffs cannot satisfy the second element of their estoppel claim. Specifically, Defendant maintains that in order "for there to be an estoppel, plaintiffs must demonstrate that Payton Lane *actually received* mortgage proceeds above $36,558,951" (the lesser amount of the mortgage which,

according to Plaintiffs, HUD would have insured had Defendant included the $3.5 million in the

Line 1a Amount). Def.'s Mem. at 17 (emphasis in original). However, Payton Lane has not

actually received the full $37,523,000.00 (the mortgage HUD insured) in mortgage proceeds.

*Id.*; Angelillo Aff., Ex. E (Def.'s Interrog. No. 25). Rather, as of the date of Payton Lane's

submission of its motion papers to the Court, HUD had not authorized PFC to release the

remaining $3,420,830.00 of the mortgage proceeds. Def.'s Mem. at 17-18; Angelillo Aff., Ex. K

at 3. Thus, Payton Lane states, it "has only realized $34,102,170 of the mortgage proceeds -- *less*

*than* the $36,558,951 that plaintiffs allege Payton Lane would be entitled to if it had included the

$3.5 million estimated liquidated damages claim in the Certificate of Actual Cost . . . ." Def.'s

Mem. at 18 (emphasis in original).

### 4.    *Payton Lane Acted In Good Faith*

Payton Lane contends that the Sureties have failed to establish required elements of a

claim for "quasi" or judicial estoppel. First, Payton Lane maintains, even if the Court were to

determine that it was obligated to report its liquidated damages claim on its 2006 tax return and

in the Certificate of Actual Cost, it "has not taken a different position in this case," and therefore

Plaintiffs cannot establish "a fundamental element of a 'quasi-estoppel' claim." Def.'s Mem. at

16. Moreover, according to Defendant, "its treatment of the claim in accordance with generally

accepted accounting principles and federal tax law constitutes a good faith basis for making the

statement, which undermines any quasi-estoppel claim." Def.'s Mem. at 16-17.

### 5.    *Interim Settlement Agreement*

Payton Lane states that the Interim Settlement Agreement (Angelillo Aff., Ex. J), entered

into between the Sureties and Payton Lane on January 22, 2009, provides further support for its

position that it has not received any "'benefit' in connection with the delay claims by virtue of the Certificate of Actual Cost." Def.'s Mem. at 19. Under the Interim Settlement Agreement, "plaintiffs agreed to dismiss certain of their claims in exchange for the release to them of approximately $3.2 million, or approximately 93% of the remaining mortgage funds currently being held back by HUD and the lender, PFC." Def.'s Mem. at 10; Angelillo Aff., Ex. J, ¶ 1. Moreover, in the Agreement, "the parties fully disclose to HUD that they each have claims and counterclaims in the litigation." Def.'s Mem. at 19; Angelillo Aff., Ex. J, ¶ 9.

According to Payton Lane, the parties entered into the Agreement "in a joint effort to furnish HUD with an acceptable basis for releasing the mortgage proceeds to the parties' mutual benefit and granting 'Final Endorsement' to the loan." Def.'s Mem. at 18-19; Angelillo Aff., Ex. J. Thus, Payton Lane contends, "the only way that Payton Lane can achieve the 'benefit' referred to by plaintiffs, i.e. the proceeds of a $37,523,000 loan, is if HUD approves the Interim Settlement Agreement and permits the loan to proceed to 'Final Endorsement.'" Def.'s Mem. at 19.[16]

### 6.    No Usurpation of HUD Authority To Determine Liquidated Damages

According to Payton Lane, there is "no legal or contractual basis" for the Sureties' position that Payton Lane's assertion of its liquidated damages claim in the instant litigation "constitutes an usurpation of HUD's administrative authority to 'administer the Project and

---

[16]    Payton Lane notes that on January 28, 2009, PFC approved the agreement and on April 30, 2009, HUD's legal counsel confirmed that the Interim Settlement Agreement "looked good." Def.'s Mem. at 19. Thus, according to Defendant, "the parties expect that the balance of the loan proceeds will be distributed in accordance with its terms in short order." *Id.* The Court does not have any further information as to the status of the Interim Settlement Agreement or the disbursement of the mortgage proceeds.

control its costs.'" Def.'s Mem. at 20 (citation omitted). As evidence of that assertion, Payton

Lane points to certain provisions in the IDI Contract, which, according to Payton Lane,

demonstrate that there is no requirement that claims or liquidated damages claims for delay (such

as Plaintiffs' and Payton Lane's claims in the instant case) be resolved by HUD. Def.'s Mem. at

20. In particular, Payton Lane highlights Rider 1, Section 4.5.3 of the IDI Contract which

provides that if disputes under the contract cannot be resolved by the dispute resolution

procedure set forth in the contract, then such disputes shall be resolved "by a court of competent

jurisdiction." Def.'s Mem. at 20-21; Angelillo Aff., Ex. D, Rider 1, § 4.5.3 (p. 31 of 38). Payton

Lane maintains that the only exception to this dispute resolution provision is for "disputes arising

from Form HUD-92554 . . . 'Labor Standards . . .'" *Id.* Article 9 of Form HUD-92554

demonstrates that where HUD reserves authority to resolve disputes to an administrative body

other than a "court of competent jurisdiction," it specifically states so, and it did not do so with

respect to liquidated damages. Def.'s Mem. at 21.

The parties' arguments having been set forth in detail, the Court now turns to the merits

of Plaintiffs' Motion.

## III.   STANDARD OF REVIEW

In reviewing a motion for summary judgment, the Court is guided by the tenets set forth

in Federal Rule of Civil Procedure 56(c), which provides, in part:

> . . . The judgment sought shall be rendered forthwith if the
> pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, show that
> there is no genuine issue as to any material fact and that the
> moving party is entitled to judgment as a matter of law . . . .

Fed. R. Civ. P. 56; *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir.

2006); *Gray v. Lutheran Social Servs. of Metro. New York., Inc.*, No. 04-2843, 2006 WL 1982859, at *3 (E.D.N.Y. Jul. 13, 2006). The moving party bears the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In addition, to determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party. *Id.* at 157; *Fischl v. Armitage*, 128 F.3d, 50, 55 (2d Cir. 1997).

Where the movant shows prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.*; *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("[e]ven where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor").

"If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Fischl*, 128 F.3d at 56 (citing *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997)). On the other hand, Rule 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to material fact and that the movant is entitled judgment as a matter of law." Fed. R. Civ. P. 56(e)(2). In other words, summary judgment is mandated if the non-moving party fails to make a showing

sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Dobbs v. Dobbs*, No. 06 CV 6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) (the Court's goal should be to "isolate and dispose of factually unsupported claims . . . .").

## IV.   DISCUSSION

### A.   Judicial Estoppel

Plaintiffs move for summary judgment on the grounds that Payton Lane previously made representations to administrative agencies (HUD and the IRS) in quasi-judicial proceedings and accepted the benefits of such representations. Therefore, under the doctrine of "quasi-estoppel" or "administrative estoppel," Plaintiffs argue that Payton Lane is bound by such representations and should not be permitted to adopt a contrary position by asserting its claim for liquidated damages in the instant litigation.

Judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding." *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037 (2d Cir. 1993); *see also New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position ....") (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). "It is a 'rare remedy' used to avoid inconsistent outcomes and to prevent litigants from abusing the power of the court." *In re Initial Pub. Offering Secs. Litig. (Liu v. Credit Suisse First Boston Corp.)*, 383 F. Supp. 2d 556, 574 (S.D.N.Y. 2005) (citing cases). A party invoking judicial estoppel must show (1) that the party against whom the estoppel is asserted took an inconsistent

position in a prior proceeding, and (2) the initial position was adopted by the first tribunal in some manner. *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (citing *Bates*, 997 F.2d at 1038). In addition, courts in the Second Circuit often consider "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 147 (2d Cir. 2005) (quoting *New Hampshire v. Maine*, 532 U.S. at 750-51); *Galin v. Goldfischer*, 03 Civ. 9019, 2008 U.S. Dist. LEXIS 106603, at *15 (S.D.N.Y. Dec. 31, 2008) (quoting *Zedner v. United States*, 547 U.S. 489, 503 (2006)).

It is well established that the doctrine of judicial estoppel applies equally where the prior statements were made to administrative agencies, *i.e.*, in administrative or quasi-judicial proceedings. *See Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir. 1997) (citing cases and applying judicial estoppel to employment discrimination claim based on position taken in prior Social Security Administration disability adjudication); *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 596, 604 (9th Cir 1996) (applying judicial estoppel to age discrimination claim based on position taken in prior workers compensation adjudication) ("the truth is no less important to an administrative body acting in a quasi-judicial capacity than it is to a court of law" (citation omitted.)). Courts have regularly found that quasi-estoppel bars a party from adopting a factual position in court that is contrary to a position previously taken on a tax return. *See Mahoney-Buntzman v. Buntzman*, 12 N.Y.3d 415, 422, 881 N.Y.S.2d 369 (N.Y. 2009) ("A party to a litigation may not take a position contrary to a position taken in an income tax return"); *PL Diamond LLC v. Becker-Paramount LLC*, 841 N.Y.S.2d 82, 2007 WL 1865044, at *9 (N.Y. Sup. Ct., N.Y. County June 6, 2007); *Meyer v. Ins. Co. of Am.*, No. 97 CIV. 4678, 1998 WL 709854,

at *11 (S.D.N.Y. Oct. 9, 1998) (plaintiff estopped from claiming, in court proceeding, entitlement to disability benefits for inability to work where she previously reported on income tax that she was employed full-time); *Estate of Ginor v. Landsberg*, 159 F.3d 1346, 1998 WL 514304, at *1 (2d Cir. 1998) (party who obtained a tax deduction by representing to IRS on tax return that a wrap note was included in a partnership's property was estopped, in a subsequent litigation, from claiming that the note was not a genuine partnership obligation); *Zemel v. Horowitz*, 815 N.Y.S.2d 496, 2006 WL 516798, at *6 (N.Y. Sup. Ct., N.Y. County Mar. 2, 2006) (plaintiffs estopped from asserting, in court proceeding, that they sold securities for the purpose of loaning the proceeds to defendant when, on their tax returns, they reported that they short-sold the securities). Quasi-estoppel likewise precludes a party from taking a position in a subsequent action that is contrary to a position taken before an administrative agency, such as HUD.[17]

"Judicial estoppel aims to 'preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions' and to 'protect judicial integrity by avoiding the risk of inconsistent results in two proceedings.'" *Negron v. Weiss*, No. 06-CV-1288, 2006 WL 2792769, at *3 (E.D.N.Y. Sept. 27, 2006) (quoting *Bates*, 997 F.2d at 1038). However, the application of judicial estoppel is highly fact-specific. *See, e.g.*, *United States v. West Prods., Ltd.*, 168 F. Supp. 2d 84, 88-89 (S.D.N.Y. 2001) (summarizing cases). Within the Second Circuit, the application of judicial estoppel is limited to situations where the risk of inconsistent

---

[17]     Although the Court was unable to find a case directly on point with the present circumstances (*i.e.*, where the purported previous inconsistent statement was made on the party's Certificate of Actual Cost), the case law is clear that the doctrine of judicial estoppel applies to positions taken before administrative agencies such as HUD (*see* citations above), and the Certificate of Actual Cost was a sworn statement made by Payton Lane under penalty of perjury. *See* Schatz Aff., ¶ 18 and Ex. 10 at 1; Pls.' Mem. at 10.

results threatens the integrity of the judicial process." *Simon*, 128 F.3d at 72-73. In other words, the previous purported inconsistent statement must have a material effect on the outcome of the subsequent proceeding. Judicial estoppel does not apply "if the statements or positions in question can be reconciled in some way . . ." *Negron*, 2006 WL 2792769, at *4 (citing *Simon*, 128 F.3d at 72-73). Similarly, the doctrine does not apply if the initial statement was the result of a good faith mistake or an unintentional error. *Id*.

### B. Analysis

To establish that Payton Lane is subject to judicial estoppel, the Sureties must show that Payton Lane took an inconsistent position in one of the prior proceedings (*i.e.*, before the IRS on its 2006 tax return or before HUD in the Certificate of Actual Cost), and that such previous position is inconsistent with the current claim for liquidated damages.

#### 1. Payton Lane's 2006 Tax Returns

The Sureties assert that Payton Lane was obligated to report its liquidated damages claim as an offset to its reported liabilities in its 2006 tax return, and that Payton Lane's failure to do so constitutes a representation to the IRS that Payton Lane was not entitled to liquidated damages in connection with the Project. Moreover, Plaintiffs argue, Payton Lane benefitted from such representation because, as a result of the omission of the liquidated damages claim, Payton Lane was able to establish a net loss for 2006. Accordingly, Plaintiffs maintain, Payton Lane is now estopped from asserting its liquidated damages claim in the instant litigation because such claim is inconsistent with its previous representation to the IRS.

According to the Sureties, Payton Lane represented in its 2006 tax return that it owed $3,910,913.00 in current liabilities, which sum did not include its pending liquidated damages

29

claim.  Pls.' Mem. at 6; Schatz Aff., ¶ 27 and Ex. 18 at 15, Sched. L, § 7.  Specifically, the

Sureties contend that the $3,910,913.00 in current liabilities was comprised of (1) $2,948,306.00

in "Retainage Payable," and (2) $962,602.00 for certain of the Sureties' change order requests.[18]

Schatz Aff., ¶ 28.  According to Plaintiffs, the $962,602.00 is a component of the $1,508,537.00

claimed by Payton Lane for "Accrued Items Payable," as set forth on the next line of Schedule L,

Section 7 of the tax return.  *Id*. and Ex. 18.  As discussed above, the Sureties submitted

documents obtained from Payton Lane's auditors, which the Sureties maintain demonstrate that

the $3,910,913.00 did not include any offset or deduction of Payton Lane's claim for $3.5 million

in liquidated damages.  Schatz Aff., ¶ 28. and Ex. 19.

It is true that, pursuant to IRS regulations, tax returns are sworn statements made under

Payton Lane does not dispute that it did not include its liquidated damages claim in its

2006 tax returns.  Rather, Payton Lane asserts that it "did not make any representation at all

concerning this claim" on its 2006 tax return, and that it was not required to do so.  Def.'s Mem.

at 3, 13, 15.  Payton Lane maintains that under applicable case law and accounting rules,

conditional payments, such as a claim for liquidated damages in a pending litigation, are not

reported as income until the litigation has concluded and the right to receive such payment is

certain.  *Id*. at 14-15.  The Court is unaware of Payton Lane's position with respect to the

Sureties' argument, raised for the first time in the Sureties' Reply, that Payton Lane took an

inappropriate deduction

It is true that, pursuant to IRS regulations, tax returns are sworn statements made under

---

[18]     The Court notes that, although these are the numbers set forth on Schedule L, Section 7 of the 2006 tax return (Schatz. Aff., Ex. 18 at 15), the sum of $2,948,306.00 and $962,602.00 is $3,910,908.00, not $3,910,913.00 as appears in Plaintiffs' papers.

the penalty of perjury. *See, e.g.*, 26 U.S.C. § 6065 ("any return, declaration, statement, or other document required to be made under any provision of the internal revenue laws or regulations shall contain or be verified by a written declaration that it is made under the penalties of perjury"); *Meyer*, 1998 WL 709854, at *8 (citing cases); *see also* Schatz Aff., Ex. 18 at 1. Thus, Payton Lane declared all statements contained in the 2006 tax return to be true under penalty of perjury. However, Payton Lane is correct that it was *not* required to report its liquidated damages claim on its 2006 tax returns. In 2006 (as now), Payton Lane's liquidated damages claim was only a contingency, and therefore, Payton Lane's right to receive such payment in 2006 was far from certain. The applicable section of the United States Tax Code provides that the "amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period." 26 U.S.C. § 451(a); *see also* 26 C.F.R. 1.451-1, Treas. Reg. § 1.451-1 (General rule for taxable year of inclusion) ("Gains, profits, and income are to be included in gross income for the taxable year in which they are actually or constructively received by the taxpayer unless includible for a different year in accordance with the taxpayer's method of accounting."). A claim for liquidated damages does not fall into any of the specifically-defined exceptions to this rule (*see* 26 U.S.C. § 451(b)-(i)). Moreover, Payton Lane argues that, because its Second Counterclaim is a claim against the Sureties for delay damages, and not a "current asset," it is not properly included in Payton Lane's balance sheet as a "current asset" until the year in which "the litigation is complete and a judgment is rendered assigning a value to the liquidated damages claim. . . . ." Def.'s Mem. at 16. Payton Lane further contends that, pursuant to generally accepted accounting principles, to

31

which Payton Lane adheres, such claim was not a current asset in 2006 and therefore was not reported in the 2006 tax returns.  Def.'s Mem. at 3, 14-15.

The applicable accounting rules further support Payton Lane's position that it was not required to report its liquidated damages claim in its 2006 tax return.  The Financial Accounting Standards Board ("FASB") defines a contingency "as an existing condition, situation, or set of circumstances involving uncertainty as to possible gain . . . or loss."  FASB, Original Pronouncements FAS5-2 (footnote omitted).[19]  Statement of Financial Accounting Standards No. 5 lists "[p]ending or threatened litigation" as an example of a loss contingency, *id*. at FAS5-3, and discusses the factors to be considered "in determining whether accrual and/or disclosure is required with respect to pending or threatened litigation and actual or possible claims and assessments," *id*. at FAS5-8.  "Thus, the FAS view a lawsuit as a contingency." *Emerald Coast Finest Produce Co., Inc. v. United States*, 79 Fed. Cl. 466, 473 (Fed. Clms. Ct. 2007) (finding that a lawsuit is a contingent asset, not an accounts receivable); *see also In re Blast Energy Servs., Inc.*, 396 B.R. 676, 706-07 (Bankr. S.D. Tex. 2008) (finding *Emerald* "persuasive" and concluding that a party's claim is not an account receivable, but rather, a contingency).  FAS 5 ("Accounting for Contingencies") further provides that "[c]ontingencies that might result in gains usually are not reflected in the [company's financial] accounts since to do so might be to recognize revenue prior to its realization."  FASB, Original Pronouncements

_____

[19]    In terms of the myriad authoritative literature regarding generally accepted accounting principles ("GAAP"), the Statements of Financial Accounting Standards ("FAS") of the Financial Accounting Standards Board ("FASB") is considered to be "at the top of the GAAP hierarchy."  *Emerald Coast Finest Produce Co., Inc. v. United States*, 79 Fed. Cl. 466, 473 (Fed. Clms. Ct. 2007) (citing Jan R. Williams & Joseph V. Carcello, GAAP Guide Level A: Restatement and Analysis of Current FASB Standards xii (2007) (GAAP Guide)).

FAS5-17(a) (annexed as Exhibit I to the Angelillo Aff.).

In their Reply Memorandum of Law, the Sureties appear to have shifted their argument somewhat, asserting that in its 2006 tax return, Payton Lane took a deduction from its liabilities "based on the $3,919,913.00 it represented it owed the Sureties. . . ." Pls.' Reply Mem. at 6. The Sureties argue that Payton Lane "was required to include on its tax return <u>only</u> those liabilities that it admitted were owed and which it had paid. . . . ." *Id.* (emphasis in original). In support of this position, the Sureties cite 26 C.F.R. § 1.461-1(a)(2) ("General rules for taxable year of deduction), which provides as follows:

> Under an accrual method of accounting, a liability (as defined in § 1.461-1(c)(1)(ii)(B)) is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability. . . .

26 C.F.R. § 1.461-1(a)(2). To establish that Payton Lane took a net loss based upon the $3,919,913.00 owed to the Sureties (as represented by Payton Lane in Line 1a of the Certificate of Actual Cost), the Sureties refer to Payton Lane's 2006 tax return (Schatz Aff., Ex. 18) which, they assert, reflects that in 2006, Payton Lane took a "net loss" of $3,246,302.00 (F 0001504, line 21[20]). The Sureties state that this net loss amount is calculated as the difference between Payton Lane's "Total gross rentals ($2,752,608.00) (Line 17) and "Total expenses" ($5,998,910.00) (Line 18). Pls.' Reply Mem. at 6 n.2. The Sureties further claim that the "Total expenses" includes, *inter alia*, "buildings and other depreciable assets" in the amount of $46,208,332.00

---

[20]      Although the Sureties refer to this entry as a "net loss," it is actually the net loss on Payton Lane's real estate income. Schatz Aff., Ex. 18 at F 0001504, line 21.

(F 0001496, Lines 10a-10b), which is comprised, in part, of the $3,910,913.00 owed by Payton Lane to the Sureties. *Id.* In addition, the Sureties maintain that Payton Lane's "net loss is reflected on the [2006] K-1 of Sam Klein, the purported then 100% owner of the stock of Payton Lane." *Id.*; Schatz Aff., Ex. 18 at F 000114, Line 2. Based upon the information provided by the Sureties, the Court is unable to determine whether Payton Lane took this purported deduction and, if so, whether such deduction was based upon the amount owed to the Sureties and whether it was appropriate. Moreover, the Sureties have not shown what relation, if any, this asserted deduction has to their argument that, in the 2006 tax returns, Defendant made a representation regarding its liquidated damages claim which is inconsistent with its Second Counterclaim asserted in this litigation.

Based upon the foregoing analysis, the Court finds that Payton Lane was not obligated to include on its 2006 tax returns its claim for liquidated damages. Moreover, the cases cited by the Sureties at pages 8-9 of their Memorandum of Law and at pages 2-4 of their Reply Memorandum of Law are distinguishable. The referenced cases stand for the proposition that "New York Courts will bar a party from adopting a factual position in court that is contrary to a position taken on a tax return." Pls.' Mem. at 8. However, this maxim is not disputed here. In all of the cases addressed by Plaintiffs, the courts found that a party was taking a position in a current litigation which was clearly inconsistent with a position previously asserted in another judicial or administrative forum and, therefore, the party was estopped from taking the current position. *See Mahoney-Buntzman v. Buntzman*, 12 N.Y.3d 415, 422, 881 N.Y.S.2d 369 (N.Y. 2009) (in divorce proceeding, husband was estopped from claiming that funds were not marital property where husband had previously reported on his tax return that such funds were business income);

*Naghavi v. New York Life Ins. Co.*, 260 A.D.2d 252, 688 N.Y.S.2d 530-31 (1st Dep't 1999) (insured who sought to recover under a disability insurance policy was "bound by his [earlier] contrary representations in the income tax returns he filed for those years[,]" which stated that he earned less than the minimum amount required for issuance of such insurance policy); *Acme Am. Repairs, Inc. v. Uretsky*, 39 A.D.3d 675, 676-77, 834 N.Y.S.2d 542, 544 (2d Dep't 2007) (deeming the landlord's estate tax return, which contained an appraisal based upon the lease at issue in the litigation, to be a quasi-judicial representation regarding the existence of the lease and tenant was therefore entitled to judgment as a matter of law on declaratory judgment claim as to the existence of the lease); *Meyer v. Ins. Co. of Am.*, No. 97 CIV. 4678, 1998 WL 709854, at *10 (S.D.N.Y. Oct. 9, 1998) (In litigation involving Plaintiff's entitlement to disability benefits, Plaintiff was estopped from claiming she was "totally disabled" because, during the relevant time period, she had reported on her tax return that she was employed full-time); *Ginor v. Landesburg*, 159 F.3d 1346, 1998 WL 514304, at *1 (2d Cir. 1998) (Plaintiff estopped from arguing that a wrap note was cancelable at will when he had previously reported on his tax return that the note was a genuine debt obligation); *MJD Constr., Inc. v. Woodstock Lawn & Home Maint.*, 293 A.D.2d 516, 517, 740 N.Y.S.2d 402, 403 (2d Dep't 2002) (property owner estopped from denying that it owed money to a subcontractor because such position conflicted with a position previously taken before the bankruptcy court); *Zemel v. Horowitz*, 11 Misc.3d 1058(A), 2006 WL 516798, at *6 (plaintiffs estopped from asserting they sold stock and loaned the proceeds when previous tax return did not contain required report of gain from the sale of stock) (N.Y. Sup. Ct. N.Y. County, Mar. 2, 2006).  In each of these cases, the representations related to a finite item (*i.e.*, a defined benefit under an insurance plan, a wrap note, etc.), not a contingency

that may or may not ripen into a finite asset. In contrast, Payton Lane did not make any earlier representation regarding its entitlement to liquidated damages, and, therefore, there is no previous position which is inconsistent with its counterclaim for liquidated damages in the instant action.

Thus, the Court concludes that Payton Lane did not make any representation to the IRS in its 2006 tax returns with regard to its entitlement to liquidated damages in the instant action. Accordingly, the doctrine of judicial estoppel cannot be applied to Payton Lane's representation of current liabilities in its 2006 tax return.

Because the Court finds that Payton Lane did not make any representation to the IRS regarding its entitlement to liquidated damages, it is not necessary to address the remaining components of the Sureties' estoppel argument, namely whether (1) such position was adopted by the IRS, (2) Payton Lane benefitted as a result of such purported representation, or (3) Payton Lane would derive an unfair advantage or impose an unfair detriment upon the Sureties if not estopped from asserting the liquidated damages claim in the instant action.

### 2. Payton Lane's Certificate of Actual Cost

The Sureties contend that in its Certificate of Actual Cost submitted to HUD, Payton Lane was required to include its liquidated damages claim in Line 1a ("Amount due under terms of Lump-Sum Construction Contract (as adjusted)") of that form, and Payton Lane's failure to do so constitutes a representation to HUD that Payton Lane was not entitled to liquidated damages in connection with the Project. Furthermore, the Sureties argue, Payton Lane benefitted from such representation because HUD approved a higher mortgage loan based upon Payton Lane's

omission of the $3.5 million from Line 1a and, as a result, Payton Lane was not required to pay additional capital into the Project. Accordingly, Plaintiffs maintain, Payton Lane is now estopped from asserting its liquidated damages claim here because such claim is inconsistent with its previous representation to HUD.

Specifically, the Sureties assert that in the Certificate of Actual Cost, Payton Lane represented that $3,910,913.00 was the full retainage to be paid to the Sureties and this amount did not include Payton Lane's $3.5 million liquidated damages claim. Pls.' Mem. at 7. The Sureties contend that, under the governing contracts and HUD rules, Payton Lane was required to account for liquidated damages, if any, in Line 1a of the Certificate of Actual Cost. Pls.' Mem. at 14; Schatz Aff., ¶ 17 and Ex. 10. In Line 1a, which calls for the "Amount due under terms of Lump-Sum Construction Contract (as adjusted)," Payton Lane entered $31,990,523.00. Payton Lane represented that, of this amount, $28,079,610.00 had previously been paid to Plaintiffs (Line 1a, Column A), and that $3,910,913.00 was due to be paid to Plaintiffs within 45 days after final endorsement (Line 1a, Column B). Schatz Aff., ¶ 19 and Ex. 10; Pls.' Mem. at 5-6, 14. According to the Sureties, the $3,910,913.00 in Line 1a, Column B reflected the Sureties' full retainage of $2,948,396.00 and certain change orders in the amount of $962,607.00. Pls.' Mem. at 15. As noted above, the Sureties submitted documents obtained from Payton Lane and from HUD during the course of discovery which they maintain demonstrate that the $3,910,913.00 did not include any offset or deduction for Payton Lane's liquidated damages claim. Schatz Aff., ¶ 20 and Exs. 10, 12-15.

Payton Lane does not dispute that it did not include its liquidated damages claim in Line 1a of the Certificate of Actual Cost. Rather, Payton Lane contends that its purported "failure to report the liquidated damages claim . . . as a fixed actual receivable on the Certificate of Actual Cost" is not inconsistent with its assertion of the liquidated damages claim in the instant case. Def's. Mem. at 13. Payton Lane further maintains that "it did not make any representation at all concerning this claim on . . . the Certificate of Actual Cost[,]" and that it was not required to do so. *Id*. In connection with the Certificate of Actual Cost, Payton Lane states that it was required to "present fairly, in all material respects, the actual costs of Payton Lane Nursing Home, Inc. . . ." Def.'s Mem. at 15; Angelillo Aff., Ex. F at 1. According to Payton Lane, its liquidated damages claim in 2006 was a contingency, not an accounts receivable, and, therefore that item was not properly included in Line 1a, which called for the actual cost of the Project to date. Def.'s Mem. at 15; Angelillo Aff., Ex. F at 19. Moreover, Payton Lane asserts that its auditors "specifically advised HUD of the limited exceptions to generally accepted accounting principles that they applied pursuant to Government Auditing standards, none of which had anything to do with accounting for contingent assets." Def.'s Mem. at 15; Angelillo Aff., Ex. F at 17.

Based upon the evidence currently before the Court, there are issues of material fact regarding whether Payton Lane was required to include its claim for liquidated damages in Line 1a of the Certificate of Actual Cost. On one hand, the Sureties point to Article 2(C) of the IDI Contract, which provides that, with respect to liquidated damages, "the actual cost of interest, taxes, insurance mortgage insurance premiums and contruction and permanent loan extension fees . . . for the period from the scheduled date of completion through the date construction was

actually completed, shall be determined" "[w]hen the Owner cost certifies to HUD." Schatz

Aff., Ex. 5, Art. 2(C). At that point, "[t]he lesser of the liquidated or actual damages shall be

applied[, and] [t]he applicable amount shall be reduced by the project's net operating income (as

determined by the Commissioner) for the damage period." *Id.* The Sureties argue that under

Article 2(C), Payton Lane was obligated to include its liquidated damages claim in the Certificate

of Actual Cost and, at that point, HUD would determine its entitlement, if any, to such liquidated

damages. Pls.' Mem. at 13-14. In support of this position, the Sureties rely on HUD's "Cost

Certification Guide for Mortgagors and Contractors of HUD-Insured Multifamily Projects"

(HUD Handbook No. 4470.2) (Schatz Aff., Ex. 11), which requires the owner in Line 1a to

> enter the actual amount of cash paid or to be paid by the mortgagor
> under the terms of the construction contract as adjusted upward or
> downward by the HUD estimated cumulative effect of approved
> construction change orders, **liquidated/actual damages**, or incentive
> payment, if applicable.

Schatz. Aff., ¶ 17 and Ex. 11, subpara.402(A) (emphasis added). The Sureties also highlight

HUD's Cost Certification Review, which shows that a HUD examiner reviewed Payton Lane's

Certificate of Actual Cost and noted that "**Incentive and Liquidated Damages are both not**

**applicable**" (emphasis in original) and that liquidated damages were "N/A." Schatz Aff., ¶ 22

and Ex. 14; Pls.' Mem. at 6. Finally, the Sureties argue that under HUD Regulation 24 C.F.R.

§ 200.96, Payton Lane was required "to account for any alleged delay damages as part of the

cost-certification process." Pls.' Mem. at 12. That statute, entitled "Certificates of actual cost,"

authorizes the HUD commissioner to prescribe the form for the mortgagor's certificate of actual

cost, which is to "be submitted upon completion of the physical improvements to the satisfaction

of the Commissioner and before final endorsement . . . [and which] shall show the actual cost to the mortgagor, after deduction of any kickbacks, rebates, trade discounts, or other similar payments to the mortgagor . . . of construction and other costs, as prescribed by the Commissioner." 24 C.F.R. § 200.96(a). Section 200.96 further provides that the Certificate of Actual Cost be verified by an independent Certified Public Accountant (24 C.F.R. § 200.96(b)), and that "[u]pon the Commissioner's approval . . . such certification shall be final and incontestible except for fraud or material misrepresentation on the part of the mortgagor." 24 C.F.R. § 200.96(c).

On the other hand, Payton Lane claims that it was not required to include its liquidated damages claim in the Certificate of Actual Cost because, under HUD rules, Payton Lane was only required to "identify its actual construction costs." Thus, according to Payton Lane, "in accordance with this requirement, and consistent with generally accepted accounting principles, Payton Lane included only those costs that it properly considered its actual construction costs, i.e. the outstanding contract balance and certain change orders." Def.'s Mem. at 8. Payton Lane further argues that it "neither included its potential liquidated damages claim (which had not yet been asserted) nor did it include plaintiffs' contingent claims against it – including their claims of delay on Payton Lane's part – which, at the time of filing, exceeded $17 million." *Id.*

Moreover, Payton Lane states that, notwithstanding the omission of the liquidated $3.5 million from Line 1a, it informed HUD that the amounts contained in the Certificate of Actual Cost did not include any contingent claims. For example, Payton Lane points to its Auditor's Report (Angelillo Aff., Ex. F) which, pursuant to HUD rules, was submitted to HUD along with

the Certificate of Actual Cost,[21] in which "Payton Lane's auditor specifically advised HUD of the existence of this lawsuit, and that it included claims by plaintiffs for, *inter alia*, delay, as a 'contingency.'" Def's Mem. at 8-9[22]; Angelillo Aff., Ex. F at 19.

Contrary to the Sureties' claim that HUD's approval of the Certificate constituted a final determination by HUD that Payton Lane was not entitled to liquidated damages, Payton Lane maintains that such approval was only for preliminary purposes. Def.'s Mem. at 9. In support of this position, Payton Lane references the portion of HUD's Maximum Insurable Mortgage (form HUD-92580) (Schatz Aff., Ex. 15; Angelillo Aff., Ex. G) which states that "HUD will finally endorse, the above project, secured by a first mortgage upon the land and property included in the project, in an amount not to exceed that set forth herein below" ($37,523,000.00). Def.'s Mem. at 9; Schatz Aff., Ex 15 and Angelillo Aff., Ex. G at 1. Payton Lane contends that liquidated damages would not be determined until "Final Endorsement," which according to Defendant, is

---

[21]     Payton Lane takes issue with Plaintiffs' omission of the Auditors Report from Exhibit 10 to the Schatz Affidavit, which contained only Payton Lane's Certificate of Actual Cost. Def.'s Mem. at 8. Payton Lane states that it was required to submit the Auditors Report along with the Certificate (*id*.; Angelillo Aff., Ex. N (HUD Handbook, § 3-2(B)(7)), and "Plaintiffs' failure to include Payton Lane's entire submission to HUD, including the Auditor's Report . . . presents a distorted picture of the facts of this case." Def.'s Mem. at 8.

[22]     Based upon the Court's careful reading of Payton Lane's Auditor's Report (Angelillo Aff., Ex. F), which was submitted to HUD with the Certificate of Actual Cost, it appears that the contingencies discussed by the Auditors are addressed specifically to the claims asserted by the Sureties against Payton Lane, for which Payton Lane might potentially be liable. Angelillo Aff., Ex. F at 19. There is no mention of Payton Lane's potential claim for liquidated damages against the Sureties, pursuant to which Payton Lane would receive money. Although the Court recognizes that the Auditor's Report, which is dated February 17, 2006, was submitted to HUD before Payton Lane asserted its liquidated damages claim against the Sureties in this action (Payton Lane filed its Answer and Counterclaims on April 9, 2007 [DE 27]), the events giving rise to Payton Lane's Second Counterclaim had already occurred.

"the process by which HUD authorizes the final disbursement of the remaining mortgage proceeds and certifies that the 'terms and conditions of the HUD [insurance] commitment have been met to the commissioners satisfaction. . . ." Def.'s Mem. at 9 (quoting, in part, 24 C.F.R. § 200.100(b)[23] (Angelillo Aff. Ex. M)). According to Payton Lane, "in its approval, HUD also specifically noted that the end result might differ from the approved amount, and that the approved mortgage amount might be further reduced when actual costs were established." Def.'s Mem. at 9.

Although the Sureties and Payton Lane have presented documentary evidence in support of their respective positions, neither side has provided evidence from which the Court can definitively make a finding at this time on the question of whether Payton Lane was required to include its liquidated damages claim in the Certificate of Actual Cost. The Court on its own has not found any statute, regulation, or decision directly on point.[24] Viewing the evidence and all factual inferences arising from that evidence in the light most favorable to Payton Lane, as the Court must, the Court finds that there exists a material issue of fact whether Payton Lane was required to include its liquidated damages claim in the Certificate of Actual Cost. Because the issue whether Payton Lane was required in the first instance to provide such information in the

---

[23]     Section 200.100(b), entitled "Final Endorsement," provides as follows: "When all advances of mortgage proceeds have been made and all the terms and conditions of the commitment have been met to the Commissioner's satisfaction the Commissioner shall indicate on the original credit instrument the total of all advances approved for insurance and again endorse such instrument." 24 C.F.R. § 200.100(b) (Angelillo Aff., Ex. M).

[24]     The Court notes that although helpful, the HUD Handbook is neither a statute nor a regulation, and has not been promulgated by HUD so as to give it the force of law. *See In re Mortg. Escrow Deposit Litig. (Allen v. Citicorp Mortg. Co.*), MDL 889, 1995 U.S. Dist. Lexis 1555, at *7 (N.D. Ill., Feb. 9, 1995) (citation omitted).

Certificate is uncertain, the Court cannot conclude, for purposes of this motion, that Payton Lane made any representation to HUD that is inconsistent with the current claim for liquidated damages. Therefore, the Court finds that the Sureties have not met their substantial burden to establish that quasi-judicial estoppel applies, in these circumstances, to Payton Lane's Second Counterclaim for liquidated damages and that issue must be left for trial.

## V.   CONCLUSION

For all of the foregoing reasons, the Sureties' Motion for Partial Summary Judgment on Payton Lane's Second Counterclaim for liquidated damages is DENIED.


**SO ORDERED.**

Dated:  Central Islip, New York
        January 27, 2010

                                        /s/ A. Kathleen Tomlinson
                                        A. KATHLEEN TOMLINSON
                                        U.S. Magistrate Judge