**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY and AMERICAN
MOTORISTS INSURANCE COMPANY,

Plaintiffs,

- against -

PAYTON LANE NURSING HOME, INC.,
PERKINS EASTMAN ARCHITECTS, P.C. and
LINCOLN GENERAL INSURANCE COMPANY,

Defendants.
------------------------------------------------------------------X

**MEMORANDUM**
**AND ORDER**
CV 05-5155 (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.    PRELIMINARY STATEMENT

This Memorandum and Order is the third and last determination concerning a series of

summary judgment motions brought by the parties to this action.  Here the motion [DE 177] is

brought by Defendant Perkins Eastman Architects, P.C. ("Defendant" or "Perkins") seeking

dismissal of Plaintiffs' claim for breach of contract.  The claims and defenses arise out of the

construction of Payton Lane Nursing Home in Southampton, New York.

In support of its motion, Perkins relies upon its Local Rule 56.1 Statement of Undisputed

Facts ("Def.'s 56.1 Stmt.") [DE 177-2]; Memorandum of Law in Support of Defendant's Motion

for Partial Summary Judgment ("Def.'s Mem.") [DE 179]; the Affirmation of Stephen P.

Schreckinger ("Schreckinger Aff.") [DE 177-1], to which numerous exhibits are annexed [DE

177, Exs. A-J]; and the Affidavit of Charles Williams ("Williams Aff.") [DE 178], with exhibits

annexed [DE 178, Exs. 1-2].  Perkins also submitted a Response to Plaintiffs' Rule 56.1

Counterstatement ("Def.'s 56.1 Counterst.") [DE 181]; Reply Memorandum of Law in Further

Support of the Motion for Summary Judgment ("Defs.' Reply Mem.") [DE 182]; and the Reply

Affidavit of Charles Williams ("Williams Reply Aff.") [DE 180], to which additional exhibits

are annexed [DE 180, Exs. 1-2].

In opposition to the motion, Plaintiffs American Manufacturers Mutual Insurance

Company and American Motorists Insurance Company ("Plaintiffs" or "Sureties") rely upon

their Responses to Defendant's Rule 56.1 Statement ("Pls.' 56.1 Response") and Plaintiffs'

Counterstatement of Material Facts ("Pls.' 56.1 Counterst.") [DE 185-21]; Memorandum of Law

in Opposition to Defendant's Motion for Summary Judgment ("Pls.' Mem.") [DE 186]; and the

Affidavit of Eric Schatz ("Schatz Aff.") [DE 185], with exhibits annexed [DE 185, Exs. 1-20].

The Court has considered all of the submissions, the applicable case law, and the positions

asserted by counsel during oral argument on the motion. For the reasons set forth below,

Perkins' Motion for Summary Judgment is DENIED.

## II.  STATEMENT OF FACTS

The following facts are drawn primarily from the pleadings and the parties' Rule 56.1

Statements where those facts are not disputed. On considering a motion for summary judgment,

the Court construes the facts in the light most favorable to the non-moving party. *See*

*Capobianco v. New York*, 422 F.3d 47, 60 (2d Cir. 2001).

### A.    The Project

This action arises out of the new construction of the Payton Lane Nursing Home in

Southampton, New York (the "Project"), owned by Defendant Payton Lane Nursing Home, Inc.

("Payton Lane"). Pls.' 56.1 Counterst., ¶ 1; Def.'s Counterst., ¶ 1. The Payton Lane Nursing

Home was built pursuant to Section 232 of the National Housing Act, which was passed by

Congress "to assist in the provision of facilities for [*inter alia*] . . . the development of assisted living facilities for the care of frail and elderly persons." 12 U.S.C. § 1715w(a)(3). Under Section 232, the United States Department of Housing and Urban Development ("HUD") approved and insured the financing for the Project. Pls.' 56.1 Counterst., ¶ 2; Def.'s 56.1 Counterst., ¶ 2. According to Plaintiffs, "HUD had broad powers and sweeping control over nearly every aspect of the Project, and every significant contract, form and certification was drafted, dictated and/or approved by HUD." Pls.' 56.1 Counterst., ¶ 3.[1]

On or about November 16, 2001, IDI Construction Company, Inc. ("IDI"), the original contractor, and Payton Lane, as owner, entered into a "Construction Contract Lump Sum" in the amount of $29,717,385.00 for construction of the Project (the "IDI Contract"). Pls.' 56.1 Stmt., ¶ 4; Schatz Aff., ¶ 4 and Ex. 1; Def.'s 56.1 Counterst., ¶ 4. On December 13, 2001, PFC Corporation ("PFC") made a mortgage loan, insured by HUD, in the amount of $37,523,000.00 to Payton Lane as owner/mortgagor, which loan included the $29,717,385.00 to be paid to IDI under the IDI Contract. Pls.' 56.1 Stmt., ¶ 5; Schatz Aff., ¶ 5. In connection with the IDI Contract and the mortgage loan, the Sureties issued a performance bond on behalf of IDI in favor of Payton Lane, HUD and PFC, all as obligees, in the amount of $29,717,385.00. Def.'s 56.1 Stmt., ¶ 9; Schreckinger Aff., Ex. C; Pls.' 56.1 Counterst., ¶ 6; Schatz Aff., ¶ 4 and Ex. 2.

**B.     The PEA Agreement**

According to the Sureties, in 1994, Defendant Perkins entered into an agreement with Payton Lane (the "PEA Agreement") to perform services in connection with the Project, which

---

[1]     Perkins denies this allegation "to the extent [it] . . . is not supported by the evidentiary citation and includes legal conclusions." Def.'s 56.1 Counterst., ¶ 3.

services were to be divided into two phases -- design of the Project and construction supervision. Pls.' 56.1 Stmt. ¶ 7; Schatz Aff., ¶ 5 and Ex. 3; Def.'s 56.1 Stmt., ¶ 5; Williams Aff., ¶ 3 and Ex. 1.[2]  Article 1.4 of the PEA Agreement governs Perkins' responsibilities during the construction phase of the Project and is entitled "Administration of the Construction Contract." Williams Aff., Ex. 1; Schatz Aff., Ex. 4.  Under Article 1.4, Perkins was required to "determine the amounts owing to [IDI] based on observations at the site and on evaluations of [IDI's] Applications for Payment, and issue Certificates for Payment in such amounts."  Williams Aff., Ex. 1 and Schatz Aff., Ex. 4, Art. 1.4.7.  The parties refer to this as Perkins' "payment certification responsibilities."  Def.'s 56.1 Stmt., ¶ 7; Pls.' 56.1 Response, ¶ 7.  The Sureties contend that Perkins' responsibilities further included, but were not limited to,

> reporting all observed non-compliance with contract documents and unacceptable performance by the contractor, exploiting all avenues to obtain compliance with the contract, keeping the owner and HUD informed of the progress of the work, guarding the owner and HUD against defects and deficiencies, etc. and otherwise complying with the HUD form Amendment and HUD Handbook 4460.1.

Pls.' 56.1 Response, ¶ 7; Schatz Aff., ¶¶ 4-7.

---

[2]      The version of the PEA Agreement submitted by Perkins as Exhibit 1 to the Williams Affidavit was signed by Perkins and Payton Lane on June 26 and July 6, 1998, respectively. However, the Sureties dispute that this document is the true copy of the PEA Agreement.  Pls.' 56.1 Response, ¶ 6.  Rather, the Sureties submit that Perkins and Payton Lane first entered into an agreement dated December 15, 1994.  Id.; Pls.' 56.1 Counterst. ¶ 7; Schatz Aff., ¶ 5 and Ex. 3. The Sureties further maintain that the PEA Agreement was amended several times, ultimately resulting in the agreement presented to HUD on December 13, 2001 at the  initial endorsement of the mortgage.  Pls.' 56.1 Counterst., ¶ 8; Schatz Aff., ¶ 5 and Ex. 4.  However, the issue of which version is the effective PEA Agreement need not be resolved at this time because the provisions at issue in this motion are identical in both versions.

4

## C.    IDI's Schedule Of Values And Payment Requisitions

According to Perkins, prior to the start of construction of the Project, IDI prepared and HUD approved a Schedule of Values -- a schedule in which "the contractor apportions and allocates the construction contract amount to the different items of work the contractor is required to perform (i.e. floor slabs, masonry walls, carpentry, electrical wiring, painting, etc.). These individual items are typically referred to as 'line items.'" Williams Aff., ¶ 7; Def.'s 56.1 Stmt., ¶ 10. Perkins asserts that IDI based its payment requisitions on this Schedule of Values. Williams Aff., ¶ 7; Def.'s 56.1 Stmt., ¶ 13. "For each payment requisition IDI submitted to Perkins, IDI assigned a completion percentage to each individual line item." *Id*. Perkins contends that it was not involved in IDI's initial calculation of the amounts it apportioned and allocated to the line items in the Schedule of Values. Williams Aff., ¶ 8; Def.'s 56.1 Stmt., ¶ 11. Perkins further maintains that it "had no involvement in how IDI decided what material, labor or other work was to be included under each line item in that Schedule of Values. This information was not provided to PEA until specific line items were discussed during the payment requisition review process." Williams Aff., ¶ 8.

Perkins asserts that in order to be paid for its work, IDI was required to submit payment requisitions to Perkins, and would be paid only upon Perkins' approval of such requisitions. Def.'s 56.1 Stmt., ¶ 12; Williams Aff., ¶ 5. The Williams Affidavit contains a detailed description of the process followed by Perkins in reviewing IDI's payment requisitions. IDI first submitted to Perkins a draft of a payment requisition (referred to as "Pencil Requisitions"), which indicated the percentages of work IDI deemed complete as of the date of requisition. Williams

Aff., ¶ 9; Def.'s 56.1 Stmt., ¶ 19.[3]  A Perkins representative reviewed these Pencil Requisitions and then met with IDI representatives at the site "to fully understand the scope of the work IDI included under its line item descriptions as well as the amounts and percentages IDI indicated were complete for each said line item."  Williams Aff., ¶ 9.  Perkins then

> (1) conducted an initial walk-through of the site with IDI to review the specific work where IDI was requesting payment; (2) marked up the pencil requisitions to indicate the reductions PEA deemed appropriate based on their site walk-through with the supporting documentation reviewed (such as delivery tickets);[4] (3) met with IDI, Payton Lane and the HUD inspector at a further site meeting to review IDI's modified payment requisition based upon PEA's mark-ups and comments; and (4) typically conducted a second walk-through with IDI, the HUD inspector and Payton Lane after the meeting and prior to certification.

Williams Aff., ¶ 10.

Perkins contends that HUD regulations required the HUD inspector assigned to the Project to certify all of IDI's payment requisitions prior to payment.  Def.'s 56.1 Stmt., ¶ 14; Williams Aff., ¶ 5.  Plaintiffs admit this statement, but also "aver that [HUD's] certification is limited and made in reliance on the performance of the architect."  Pls.' 56.1 Response, ¶ 14; Schatz Aff., Ex. 5 (HUD Handbook), ¶ 3-4(C).

---

[3]    The Sureties contend that several of the "pencil requisitions" referred to in the Williams Affidavit "either do not exist or were not produced by Perkins, including nos. 2, 12, 19 and 20."  Schatz Aff., ¶ 24 n.4.

[4]    The Sureties note that "Mr. Williams alleges in ¶ 10 of his Affidavit in Support. . . that Perkins reviewed and adjusted IDI's pencil requisitions, or initial applications for periodic payment, although, curiously, he does not once in his affidavit allege that Perkins' certifications accurately reflected the percentage of completed work during IDI's tenure.  In fact any such notion is belied by the documentary evidence.  Schatz Aff., ¶ 24.

### D. Takeover Agreement

In April 2003, Greyhawk North America, LLC ("Greyhawk") was hired to serve as the Sureties' construction consultant and authorized representative on the Project. Def.'s 56.1 Stmt., ¶ 16; Schreckinger Aff., Ex. E at 21-23; Pls.' 56.1 Response, ¶ 16; Schatz Aff., ¶ 1. Eric Schatz, a Project Consultant for Greyhawk, began working on the Project in December 2003. Schatz Aff., ¶ 1.

On or about May 11, 2004, Payton Lane terminated IDI as the general contractor on the Project (Pls.' 56.1 Response, ¶ 8), and called upon the Sureties to satisfy their obligations under the performance bond. Schatz Aff., ¶ 9; Am. Compl. [DE 37], ¶ 13; Schreckinger Aff., Ex. E at 21-23. In July 2004, the Sureties and Payton Lane entered into a Takeover Agreement, to which Perkins was not a party. Def.'s 56.1 Stmt., ¶ 20; Schreckinger Aff., Ex. F; Pls.' 56.1 Response, ¶ 20; Schatz Aff., ¶ 9. The Takeover Agreement provided that Greyhawk would continue as the Sureties' "Authorized Representative with regard to completion of the remaining work" on the Project, and would "supervise the work to be performed by the Completion Contractor." Schreckinger Aff., Ex. F, ¶ 12. Pursuant to the Takeover Agreement, the Sureties paid their subrogor, Payton Lane, $4.25 million "for damages suffered by and dispute-related expenses incurred by Payton Lane, in consideration for an assignment of all claims Payton Lane has against IDI pursuant to the Contract, and as full and final settlement and general release of all claims Payton Lane has against IDI pursuant to the Contract. . . ." *Id.*, ¶ 7.

The Project was not substantially complete when the Takeover Agreement was executed. Def.'s 56.1 Stmt., ¶ 23; Schreckinger Aff., Ex. E at 313-14; Pls.' 56.1 Response, ¶ 23. The Sureties note that although Perkins was not a signatory to the Takeover Agreement, Perkins

provided to Greyhawk certain project-related documents, including a Nonconforming Work Notice Log which, according to the Sureties, "purported to identify the work performed by IDI which was not in compliance with the IDI Contract and which would have to be corrected" by the Sureties. Schatz Aff., ¶ 9 and Ex. 6.

On August 20, 2004, the Sureties entered into a "cost plus completion contract" with E.W. Howell Co., Inc. ("Howell") "to complete the remaining work identified on Exhibit A to the Takeover Agreement." Pls.' 56.1 Counterst., ¶ 15; Schatz Aff., ¶ 10. The Sureties assert that after commencing work on the Project, Howell "identified significant construction issues not disclosed by Payton Lane prior to the Takeover Agreement, for which Perkins had certified that IDI had completed." Schatz Aff., ¶ 11. In other words, the Sureties allege, Perkins had certified payment requisitions which enabled IDI to be "paid for work that it had not performed and for work which was not in conformance with the IDI Contract." Pls.' 56.1 Counterst., ¶ 20; Schatz Aff., ¶ 12.

### E. The Sureties' Claim Against Perkins

The Sureties commenced this action by filing the Complaint [DE 1] on November 3, 2005. Def.'s 56.1 Stmt., ¶ 1; Schreckinger Aff., Ex. A; Pls.' 56.1 Response, ¶ 1. The Complaint set forth three causes of action against Perkins, namely the Sixth, Seventh and Eighth Claims. Def.'s 56.1 Stmt., ¶ 2; Schreckinger Aff., Ex. A; Pls.' 56.1 Response, ¶ 2. By Order dated February 28, 2007 [DE 23], Judge Feuerstein dismissed the Sixth and Seventh Claims as against Perkins. Def.'s 56.1 Stmt., ¶ 3; Schreckinger Aff., Ex. B; Pls.' 56.1 Response, ¶ 2. However, Judge Feuerstein denied Perkins' motion to dismiss the Eighth Claim for breach of contract, finding that "[a]s a result of the alleged losses sustained by the Sureties in discharging their

performance bond obligations to Payton Lane, the Sureties became subrogated to the rights of their obligee, Payton Lane, against third parties, including Perkins, by operation of law." DE 23 (Schreckinger Aff., Ex. B) at 14.

Plaintiffs filed the Amended Complaint [DE 37] on October 17, 2007. Def.'s 56.1 Stmt., ¶ 4; Schreckinger Aff., Ex. C; Pls.' 56.1 Response, ¶ 4. In the Amended Complaint, the Sureties allege, *inter alia*, that Perkins breached the PEA Agreement by failing to fulfill its duties owed to Payton Lane (for whom the Sureties were subrogees) under that contract. Am. Compl., ¶¶ 89-96 (the "Eighth Claim"). Specifically, the Sureties assert that, under the IDI Contract and the PEA Agreement, Perkins was obligated to (1) "determin[e] that the work performed and materials furnished by IDI conformed to the requirements of the [IDI] Contract Documents[,]" and (2) "for purposes of payment to IDI, review[] and certify[] the amounts due IDI and issu[e] certificates of payment in such amounts." *Id*., ¶ 92. The Sureties further contend that PEA breached the contract by, *inter alia*, (1) "failing to properly monitor and inspect IDI's work[;]" (2) "improperly certifying on numerous occasions that certain work had been performed or completed in accordance with the Contract Documents which had not been so performed or completed[;]" (3) "failing to reject certain of IDI's work which did not conform to the Contract Documents[;]" and (4) "improperly certifying payments to IDI which were substantially in excess of the value of the work performed by IDI, which payments were made by Payton Lane to IDI." *Id*., ¶ 95; Pls.' 56.1 Counterst., ¶ 21; Schatz Aff., ¶ 2.[5]

---

[5]     In the Answer to the Amended Complaint [DE 57], Perkins "denied the truth of each and every allegation" contained in Plaintiffs' Eighth Claim. Schreckinger Aff., Ex. D, ¶¶ 26-31.

The Sureties maintain that, as a result of theses breaches of the PEA agreement, Perkins (1) certified work performed by IDI which did not meet the requirements of the IDI Contract, and (2) improperly certified payments to IDI for such non-conforming work.  Am. Compl., ¶ 94. According to the Sureties, prior to execution of the Takeover Agreement, Perkins certified that IDI had performed over 83% of the base contract work, or $24,955,811.00 of that work, in accordance with the Contract Documents.  *Id.*, ¶ 93; Pls.' 56.1 Counterst., ¶ 18; Schatz Aff., ¶ 12. Based upon Perkins' certification, Payton Lane paid $22,460,230 (90%) to IDI and held $2,460,230 (10%) in retainage.  Am. Compl., ¶ 93.  However, following the execution of the Takeover Agreement, the Sureties "determined that IDI had completed only approximately 71% of the base contract work in accordance with the Contract Documents and that Perkins should have certified a total of not more than $21,082,825 of the work was completed by IDI, of which only $18,974,543 should have been actually paid to IDI."  *Id.*, ¶ 94.  In the Amended Complaint, the Sureties seek damages in the amount of "at least $3,485.687.000," which is the difference between the amount paid by Payton Lane to IDI based upon Perkins' certification ($22,460,230.00), and the amount which, according to the Sureties, should have been paid to IDI ($18,974,543.00).  *Id.*, ¶ 96; Pls.' 56.1 Counterst., ¶ 23; Schatz Aff., ¶ 15.

## III.  THE PARTIES' POSITIONS

### A.  Perkins' Argument For Dismissal

Perkins moves for summary judgment seeking dismissal of the Sureties' Eighth Claim on the grounds that "there is no dispute that, as a matter of law, PEA is not responsible for the damages alleged by Plaintiffs and, as a matter of law, Plaintiffs *cannot* provide otherwise." Def.'s Mem. at 5 (emphasis in original).  In support of its position, Perkins asserts four

arguments:  (1) Plaintiffs have not provided any expert proof in support of their Eighth Claim;

(2) even if expert proof were not required, Plaintiffs have not shown that PEA breached the

contract with Payton Lane or breached any duty to review and certify IDI's payment requisitions;

(3) Plaintiffs' claim does not consider that PEA's certification was subject to several contractual

conditions that had not yet been met at the time the requisitions were certified; and (4) Plaintiffs'

subrogor, Payton Lane, did not suffer any damages.  *Id*. at 1.

### 1.    *The Sureties Have Not Provided Expert Proof*

Perkins characterizes the Sureties' Eighth Claim as seeking "damages based upon PEA's

alleged breach for failing to render its duties and responsibilities to review and certify contractor

payment requisitions in accordance with its contractual requirements[,]" which "resulted in an

overpayment to IDI."  *Id*. at 1, 3.  Perkins contends that, under New York law, "in order to

establish the standard of architectural care for the certification of payment requisitions and to

prove that an architect deviated from that standard, a plaintiff must submit expert proof to

support its claim."  *Id*. at 7; *see also* Def.'s Reply Mem. at 5-6.  Perkins further contends that an

expert is needed in the area of "certifying payment requisitions" to testify as to (1) "the

customary standard of care in the industry[;]" (2) "the basis for the same[;]" (3) "whether PEA

deviated from that standard and[;]" (4) "if so, how."  Def.'s Mem. at 8; *see also* Def.'s Reply

Mem. at 11.

According to Perkins, however, the Sureties have not submitted any expert proof in

support of their Eighth Claim and, pursuant to this Court's January 30, 2009 Electronic Order,

their time to serve expert reports and accompanying expert disclosures under Rule 26 expired on

March 9, 2009.  Def.'s Mem. at 6; Schreckinger Aff., Ex. I.  Perkins argues that the only proof

offered by the Sureties in support of their Eighth Claim "is an 'analysis' prepared by Eric Schatz of Greyhawk[,]" who is not being proffered by the Sureties as an expert in this action. Def.'s Mem. at 8; Schreckinger Aff., ¶ 14 and Ex. E at 202. In particular, Perkins asserts that expert proof, which the Sureties do not provide, is required to show the standard of care and elements such as (1) that each item of work PEA allegedly improperly certified "actually appeared to be non-conforming on the date PEA *reviewed* the work;" (2) that "the scope of work for the specific IDI line items PEA allegedly improperly certified share the same scope of work utilized by Mr. Schatz in his 'analysis;'" and (3) that the Sureties' discovery of the non-conforming work "did not warrant 'exhaustive and continuous' inspections (if they even *existed* at the time of PEA's review)." Def.'s Mem. at 15 (emphasis in original). Likewise, Perkins maintains that because "Plaintiffs are unaware of the actual site conditions at the time the payments were certified and do not know what scope of work was included in the Schedule of Values line item descriptions certified – Plaintiffs claim here is based on nothing more than speculation." *Id*. at 16.

Thus, Perkins claims, since the Plaintiffs have (1) not disclosed an expert witness, (2) have not provided an expert report, and (3) have not provided the expert proof needed to show how Perkins deviated from the accepted standard of care, the Sureties' claim should be dismissed. *Id*. at 9.

### 2. The Sureties Have Not Established That Perkins Breached The Agreement

Perkins argues that even if expert proof were not required, Plaintiffs have not proven two elements of a breach of contract claim, namely, that Payton Lane performed its obligations under the PEA Agreement and that Perkins failed to fulfill its duties. First, Perkins contends that the Sureties have not shown that Payton Lane "properly rendered its duties under the contract,

12

including making PEA 'aware of any fault or defect in the Project or nonconformance with the

Contract Documents' by giving PEA 'prompt notice thereof.'" Def.'s Mem. at 10 n.3; Perkins

Aff. Ex. 1 (PEA Agreement), § 2.8; *see also* Def.'s Reply Mem. at 15. Second, Perkins

maintains that Plaintiffs have not shown that Perkins breached its duties under the PEA

Agreement and that Perkins has, in fact, fulfilled its duties "in connection with reviewing and

certifying IDI's payment requisitions." Def.'s Mem. at 10-11; Schreckinger Aff., Ex. C, ¶ 92.

Perkins argues that the Sureties' analysis, which, according to Perkins, consists solely of the

spreadsheet entitled "Calculation of Payton Lane Overpayment to IDI as of Application #22R,

through April 16, 2004, INCLUDING RATIONALE FOR ADJUSTMENT[,]" (Schreckinger

Aff., Ex. H) -- is insufficient to support the Eighth Claim because it is based upon "speculation

and conjecture." Def.'s Mem. at 10.

　　　　Perkins further alleges that the HUD inspector certified the payment requisitions at issue

here and HUD's certifications are "the only true independent proof Plaintiffs can rely upon as to

a party who observed and evaluated the actual work in place. . . . " *Id*. at 16; Williams Aff., ¶ 15

n.2 and Ex. 2; *see also* Def.'s Reply Mem. at 15.

### 3.  *Perkins' Review Was Subject To Subsequent Contractual Conditions*

　　　　Perkins asserts the PEA Agreement provides that Perkins' certification of IDI's work was

not final but rather, was "contingent upon a further evaluation upon substantial completion,

which did not occur until *after* the Takeover Agreement (as well as subsequent tests and minor

deviations correctable prior to completion)." Def.'s Mem. at 18-19; *see also* Def.'s Reply Mem.

at 15. Thus, according to Perkins, the Sureties' Eighth Claim should be dismissed as

"premature" because Perkins' certifications were "subject to contractual conditions that had not

yet occurred at the time of the Takeover Agreement," and which would not occur until substantial completion of the Project.  Def.'s Mem. at 19.

#### 4. *Payton Lane Did Not Suffer Damages*

Pursuant to the terms of the IDI Contract, Payton Lane withheld as retainage ten percent of the payments which Perkins certified as owed to IDI.  Def.'s Mem. at 19; Schreckinger Aff., Ex. C, ¶ 15(b); Ex. F at 5.  According to Perkins, Payton Lane withheld the retainage "to ensure that, if subsequent non-conformities were realized upon closer evaluations prior to substantial completion, IDI would remedy those conditions prior to receiving the withheld amounts."  Def.'s Mem. at 20; Def.'s Reply Mem. at 15.  Thus, Perkins maintains, "since Payton Lane withheld 10% of all amounts due, Payton Lane (Plaintiffs' subrogor) was *not* damaged due to any alleged overpayment because this amount was never paid to IDI."[6]  Def.'s at 20.

### B.    The Sureties' Opposition To Dismissal

In opposition, the Sureties argue that (1) expert testimony is not required to prove its claim against Perkins for breach of contract, and (2) the Sureties' claims are based upon a fact-based analysis of Perkins' breaches (not conjecture and speculation).

#### 1. *Expert Proof Is Not Required*

The Sureties oppose Perkins' motion on the grounds that expert testimony is not required to prove that Perkins breached the PEA Agreement.  Rather, the Sureties contend, "Perkins incorrectly equates the Sureties' claim for Perkins' breaches of its contract administration duties

---

[6]     Perkins notes that it "makes no comment . . . as to any damages Payton Lane may have suffered as a result of the problems that led to IDI's termination and the Plaintiffs having to complete this Project – such as IDI's failure to correct non-conforming work, failure to pay its subcontractors, and failure to timely complete the work – as said damages and problems are unrelated to Plaintiffs' Eighth Claim as against PEA."  Def's Mem. at 20 n.4.

(which have been held <u>not</u> to require expert proof) to the standard of proof required for a design malpractice claim against an architect." Pls.' Mem. at 6. The Sureties further argue that, contrary to Perkins' position, under New York law, expert testimony is required to support allegations of malpractice only under certain circumstances. *Id*. at 6-7.

### 2.    *The Sureties Have Established The Breach Of Contract Claim*

According to the Sureties, their analysis of Perkins' requisitions is not speculative, but rather is "a detailed and thorough review of each line item in the requisitions certified by Perkins[,] . . . [which] unequivocally confirms both Perkins' over-certifications of various line items and its certifications of work known to be or subsequently identified as defective or non-conforming." Pls.' Mem. at 11. The Sureties discuss ten examples from their analysis which, they assert, "demonstrate on their face that Perkins certified for payment items that were never delivered, over certified items at grossly inflated percentages, failed to adjust for items it subsequently discovered as non-conforming, and knowingly approved non-conforming work for payment that was not in accordance with the Contract Documents." *Id*. at 13; Schatz Aff., ¶ 21; Schreckinger Aff., Exs. G, H.

### 3.    *The Sureties' Proof Is Sufficient To Support Breach Of Contract Claim*

Contrary to Perkins' claims, the Sureties point out that they have retained two experts in this action, both of whom have provided expert reports and the disclosures required under Rule 26. Pls.' Mem. at 15-15; Schatz Aff., ¶ 32 and Ex. 19 (Expert Report of Donald E. Lefler, P.E.), Ex. 20 (Expert Report of Ivan Pollack, P.E.). Plaintiffs provide excerpts from the Lefler report which, they assert, show that Lefler "offer[ed] numerous opinions regarding the quality, or lack thereof, of Perkins work. . . ." Pls.' Mem. at 14; Schatz Aff., Ex. 19, ¶¶ 12, 37, 40, 57, 61, 62.

The Sureties also provide an excerpt from Pollack's report which, they maintain, shows that Pollack "finds fault with the work of Perkins regarding the design and implementation of the HVAC and Porte Cochere sprinkler system. . . ." Def.'s Mem. at 15; Schatz Aff., ¶ 32 and Ex. 20 at 4. Thus, the Sureties contend, their proof, which consists of "detailed, factual testimony and documentation regarding Perkins' failures in administering the IDI Contract," as well as "expert testimony from licensed professional engineers[,]" is more than sufficient to support the Eighth Claim against Perkins. Pls.' Mem. at 15.

### 4. The Sureties Are Entitled To Recover From Perkins Under Equitable Subrogation

The Sureties also assert that under the doctrine of equitable subrogation, as Payton Lane's subrogees, they "have the right to pursue recovery from the party that breached to the extent of that breach. . . ." Pls.' Mem. at 16. The Sureties note that earlier in this action, Judge Feuerstein denied Perkins' motion to dismiss the Eighth Claim and stated as follows:

> As a result of the alleged losses sustained by the Sureties in discharging their performance bond obligations to Payton Lane, the Sureties became subrogated to the rights of their oblige, Payton Lane, against third parties, including Perkins, by operation of law. Subrogation is an equitable doctrine, the purpose of which is to afford a person who pays a debt that is owed primarily by someone else every opportunity to be reimbursed in full.

*Id*. (quoting DE 23 at 14-15). The Sureties further maintain that "to the extent that Payton Lane did not suffer a loss," it was not because they withheld the retainage from IDI, but rather, "because the Sureties stepped in, performed their obligations under their performance bond and in so doing absorbed a $20 million-plus loss. Under equitable subrogation, the Sureties can pursue recovery from any responsible third parties, including Perkins." Pls.' Mem. at 16.

IV.   **STANDARD OF REVIEW**

In reviewing a motion for summary judgment, the Court is guided by the tenets set forth

in Federal Rule of Civil Procedure 56(c), which provides, in part:

> . . . The judgment sought shall be rendered forthwith if the
> pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, show that
> there is no genuine issue as to any material fact and that the
> moving party is entitled to judgment as a matter of law . . . .

Fed. R. Civ. P. 56; *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir.

2006); *Gray v. Lutheran Social Servs. of Metro. New York., Inc.*, No. 04-2843, 2006 WL

1982859, at *3 (E.D.N.Y. Jul. 13, 2006).  The moving party bears the burden of meeting this

exacting standard.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  In addition, to

determine whether the moving party has satisfied this burden, the Court is required to view the

evidence and all factual inferences arising from that evidence in the light most favorable to the

non-moving party.  *Id.* at 157; *Fischl v. Armitage*, 128 F.3d, 50, 55 (2d Cir. 1997).

Where the movant shows prima facie entitlement to summary judgment, "the burden shifts

to the nonmovant to point to record evidence creating a genuine issue of material fact."

*Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).  "[T]he nonmovant cannot rest on

allegations in the pleadings and must point to specific evidence in the record to carry its burden

on summary judgment."  *Id.*; *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215

n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary

judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("[e]ven

where facts are disputed, in order to defeat summary judgment, the non-moving party must offer

enough evidence to enable a reasonable jury to return a verdict in its favor").

"If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Fischl*, 128 F.3d at 56 (citing *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997)). On the other hand, Rule 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to material fact and that the movant is entitled judgment as a matter of law." Fed. R. Civ. P. 56(e)(2). In other words, summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Dobbs v. Dobbs*, No. 06 CV 6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) (the Court's goal should be to "isolate and dispose of factually unsupported claims . . . ."). Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## V.    DISCUSSION

### A.    The Sureties' Eighth Claim Is For Breach Of Contract

Defendant seeks dismissal of Plaintiffs' Eighth Claim on the grounds that, *inter alia*, under New York law, "a plaintiff must submit some form of expert proof to support a claim that an architect failed to properly render its design or services." Def.'s Mem. at 5. In support of its

position, Perkins relies primarily on *East 89 Corp. v. Unger*, 402 N.Y.S.2d 382, 43 N.Y.2d 776 (N.Y. 1977), in which the New York Court of Appeals found that expert testimony was required to determine whether the architects, who were accused of "protracted delays in responding to Building Department objections," were liable for architectural malpractice. Def.'s Mem. at 5-6 (discussing *Unger* and other cases). Perkins' argument focuses on cases involving architectural malpractice, and Perkins maintains that "in order to establish the standard of architectural care for the certification of payment requisitions and to prove that an architect deviated from that standard, a plaintiff must submit expert proof to support its claim" Def.'s Mem. at 7 (citing *Unger*, 402 N.Y.S.2d at 382, 43 N.Y.2d at 776). Because Plaintiffs have not submitted expert proof, Perkins contends that the analysis prepared by Plaintiffs is insufficient to support the Eighth Claim and such claim should be dismissed as a matter of law. Def.'s Mem at 8-9.

In opposition the Sureties argue that in *Unger*, "the Court of Appeals [held that] 'where the alleged act of malpractice falls within the competence of a lay jury to evaluate, a plaintiff is ***not required*** to present expert testimony in support of the allegations to establish a prima facie case.'" Pls.' Mem. at 6 (quoting *Unger*, 43 N.Y.2d at 77, 402 N.Y.S.2d at 383 (emphasis in Pls.' Mem.)). Moreover, the Sureties rely on cases which followed *Unger*, where courts held that expert testimony was not required to support the cause of action against an architect. Pls.' Mem. at 7-10 (discussing cases).

The Sureties bring their Eighth Claim, as subrogees of Payton Lane, against Perkins for breach of the PEA Agreement, *not* for architectural malpractice. The Sureties assert that "the eighth claim in the Amended Complaint seeks recovery from Perkins for Perkins' contractual breaches, stating:

> *Perkins breached its duties owed to Payton Lane under the Perkins
> Contract* by, among other things, failing to properly monitor and
> inspect IDI's work, improperly certifying on numerous occasions that
> certain work had been performed or completed in accordance with the
> Contract Documents which had not been so performed or completed,
> failing to reject certain of IDI's work which did not conform to the
> Contract Documents, improperly certifying payments to IDI which
> were substantially in excess of the value of the work performed by
> IDI, which payments were made by Payton Lane to IDI."

Schatz Aff., ¶ 13 (quoting Am. Compl. (Schreckinger Aff., Ex. C), ¶ 95) (emphasis added).  The

PEA Agreement explicitly provides that "[u]nless otherwise provided in this Agreement and

incorporated in the Contract Documents, the Architect shall provide administration of the

Contract for Construction as set forth below and in the edition of the AIA Document A201,

General Conditions of the Contract for Construction, current as of the date of this Agreement."

PEA Agreement, Art. 1.4.2.  The PEA Agreement further provides that it "may be amended only

by written instrument signed by both Owner and Architect."  *Id.*, Art. 8.4.  AIA Document A201

does not provide for additional duties of the architect, outside those set forth in Article in 1.4 of

the PEA Agreement, and the Court is unaware of any modifications made to the PEA Agreement

with respect to Perkins' obligations to provide construction administration for the Project.  Thus,

pursuant to the express terms of the PEA Agreement, Perkins' duties to administer the

construction phase of the Project are governed by that contract.

      Perkins has not effectively provided an explanation in its Memoranda of Law precisely

why, in the circumstances of this case, the Sureties' claim for breach of contract should be treated

as a malpractice claim.  In the Reply, Perkins asserts that "Plaintiffs completely gloss over the

fact that, not only did the Court of Appeals hold in *Unger* that the need for expert proof is *not*

limited to architectural malpractice cases claiming negligent designs *per* se, but that New York

also expressly defines the professional practice of architecture as including "the administration of construction contracts."  Def.'s Reply Mem. at 2 (citation omitted) (emphasis in original). However, Perkins' reliance upon Section 7301 of the New York Education Law is misplaced. Section 3701 provides that

> [t]he practice of the profession of architecture is defined as rendering or offering to render services which require the application of the art, science, and aesthetics of design and construction of buildings, groups of buildings, including their components and appurtenances and the spaces around them wherein the safeguarding of life, health, property, and public welfare is concerned.  Such services include, but are not limited to consultation, evaluation, planning, the provision of preliminary studies, designs, construction documents, construction management, and the administration of construction contracts.

N.Y. Educ. L. § 7301.  The purpose of the Education Law is the "safeguarding of health, property and public welfare."  *Joseph v. Schwarz/Architectural Servs., P.C.*, 957 F. Supp. 1334, 1343 (S.D.N.Y. 1997) (quoting N.Y. Educ. Law § 7301); *see also Marshall-Schule Assocs., Inc. v. Goldman*, 523 N.Y.S.2d 16, 19, 137 Misc. 2d 1024, 1029 (N.Y. 1987) ("The obvious and avowed purpose of [sections 7201 and 7302] of the New York Education Law is to safeguard the life, health, and property of the citizens of New York.") (citation omitted).  The fact that the statute designed to regulate the architecture profession includes "the administration of construction contracts" in the definition of architecture does *not* transform the Sureties' breach of contract claim into a claim for the tort of malpractice.  *See Joseph*, 957 F. Supp. at 1339 ("merely charging a breach of a 'duty of care' does not, without more, transform a simple breach of contract into a tort claim") (quoting *Clark-Fitzpatrick v. Long Island R.R. Co.*, 70 N.Y. 2d 382, 521 N.Y.S.2d 653, 657 (N.Y. 1987)); *Kingston v. Charles A. Manganaro Consulting Eng'rs, P.C.*, 01-CV-1317, 2002 U.S. Dist. LEXIS 25505, at *6-*7 ("Kingston may not transform a

21

contract action into a tort action by simply claiming that Manganaro acted negligently.")
(citations omitted). It is true that under New York law, architects are subject to certain extra-
contractual obligations, including a professional obligation to act with reasonable care. *Joseph*,
957 F. Supp. at 1340; (citing, *inter alia, Carmania Corp., N.V. v. Hambrect Terrell Int'l*, 705 F.
Supp. 936, 937 (S.D.N.Y. 1989)). However, the Sureties do not allege malpractice or
negligence, and Perkins has not provided any evidence to persuade the Court that such assertions
should be read into the Sureties' Eighth Claim.[7] The Court's analysis, therefore, is limited to the
Sureties' claim for breach of contract as against Perkins.

### B. Perkins' Obligations Under The PEA Agreement

As noted earlier, under the express terms of the PEA Agreement, the scope of Perkins'
obligation to administer the construction phase of the Project is governed by that contract.
Likewise, whether Perkins breached is duties to Payton Lane -- including (1) whether Perkins
properly monitored and inspected IDI's work; (2) whether Perkins properly certified that IDI's
work had been completed in accordance with the Contract Documents; (3) whether Perkins failed
to reject non-conforming work performed by IDI; and (4) whether Perkins improperly certified
certain payments to IDI -- are also governed by the PEA Agreement. The Court notes that in
addressing whether Perkins breached its requisition payment obligations under the PEA
Agreement, neither party cites to any case law in support of its position (with the exception of
New York law on the elements of a breach of contract claim).

---

[7] In light of the Court's finding that Plaintiffs' Eighth Claim is for breach of
contract (and not for malpractice or negligence), the cases cited by Perkins at pages 5-6 of their
Memorandum of Law and pages 5-7 of their Reply Memorandum of Law, and by the Sureties at
pages 6-10 of their Memorandum of Law, are inapplicable to the present action and the Court
need not address such cases here.

Regarding Perkins' duties to administer the Project during the Construction Phase, the

PEA Agreement provides as follows:

> The Architect shall visit the site at intervals appropriate to the state
> of construction or as otherwise agreed by the Architect in writing to
> become generally familiar with the progress and quality of the Work
> and to determine in general if the Work is proceeding in accordance
> with the Contract Documents. However, the Architect shall not be
> required to make exhaustive or continuous on-site inspections to
> check the quality or quantity of the Work. On the basis of such on-
> site observations as an architect, the Architect shall keep the Owner
> informed of the progress and quality of the Work, and shall endeavor
> to guard the Owner against defects and deficiencies in the Work of
> the Contractor.

PEA Agreement, Art. 1.4.3. In connection with Perkins' payment certification responsibilities,

the PEA Agreement provides that Perkins "shall determine the amounts owing to the Contractor

based on observations at the site and on evaluations of the Contractor's Applications for

Payment, and shall issue Certificates for Payment in such amounts." *Id*., Art. 1.4.7. The PEA

Agreement further provides that the "the issuance of a Certificate of Payment shall constitute a

representation by the Architect to the Owner, based on the Architect's observations at the site as

provided in Subparagraph 1.4.4 and on the data comprising the Contractor's Application for

Payment, that, to the best of the Architect's knowledge, information and belief

> 1. the Work has progressed to the point indicated;
>
> 2. the quality of the Work is in accordance with the Contract
> Documents (subject to an evaluation of the Work for conformance
> with the Contract Documents upon Substantial Completion, to the
> results of any subsequent tests required or performed under the
> Contract Documents, to minor deviations from the Contract
> Documents correctable prior to completion, and to any specific
> qualifications stated in the Certificate of Payment); and
>
> 3. that the Contractor is entitled to payment in the amount certified.

*Id.*, Art. 1.4.8 (numerals added).  The agreement also provides that Perkins' issuance of a

Certification for Payment "shall not be a representation that the Architect has made any

examination to ascertain how and for what purpose the Contractor has used the moneys paid on

account of the Contract Sum."  *Id.*

On one hand, Perkins argues that the Sureties "cannot prove the third element [of a breach

of contract claim] -- that PEA improperly failed to perform its contractual obligations under its

contract --without relying on pure 'speculation and conjecture.'"  Def.'s Mem. at 10.  To support

that argument, Perkins describes the steps it followed in reviewing and certifying IDI's payment

requisitions (discussed *supra*).  Def.'s Mem. at 11; Williams Aff., ¶¶ 9-10.  Perkins also argues

that, contrary to the Sureties' allegation that Perkins breached the PEA Agreement by failing to

monitor and inspect IDI's work, Perkins fulfilled its duty under Article 1.4.3 to be "generally

familiar with the progress and quality of the Work and to determine in general if the Work is

proceeding in accordance with the Contract Documents[,]"  Def.'s Mem. at 11; Williams Aff.,

Ex. 1, § 1.4.3.  Perkins contends that it was "not required to make exhaustive or continuous on-

site inspections to check the quality or quantity of the Work[,]" and that it was "not responsible

for inspecting every piece of material that has been installed on the project on a continuous basis"

or for being "the 'guarantor' of IDI's work."  Def.'s Mem. at 11; Schreckinger Aff., Ex. E at 314,

400.  Perkins further maintains that it "duly and diligently monitored IDI's work in accordance

with its contractual obligations and the recognized standard of care."  Def.'s Mem. at 11;

Williams Aff. ¶¶ 9-10.

In response to the Sureties' claim that Perkins breached the PEA Agreement by improperly

certifying certain work had not been completed in accordance with the Contract Documents,

Perkins asserts that it fulfilled its obligation, under Article 1.4.7, to "determine the amounts owing to [IDI] based on observations at the site and on evaluations of the Contractor's Applications for Payment." Def.'s Mem. at 13; Williams Aff., Ex. 1, § 1.4.7. Perkins further notes that, under Articles 1.4.4 and 1.4.8, it was obligated to base the certifications upon its "observations," and that it was only required "to become 'generally' familiar with the construction work but was not responsible for 'exhaustive continuous on-site inspections.'" Def.'s Mem. at 13; Williams Aff., Ex. 1, §§ 1.4.4, 1.48.

Although the Court has considered Perkins' arguments, Perkins has not provided the Court with any substantive information or documents by which to establish a generally accepted course of conduct against which Perkins' performance under the PEA can/should be measured. For example, Perkins could have submitted the applicable provisions of the AIA Architect's Handbook on Professional Practice, or another similar authoritative work, to show that Perkins' conduct was in accord with its payment certification responsibilities under the PEA Agreement.

Furthermore, Perkins' discussion of the Sureties' analysis of the alleged overpayments (Schreckinger Aff., Exs. G, H) does not establish that Perkins is entitled to summary judgment. Rather, Perkins criticizes the analysis, alleging that it is flawed because, *inter alia*, (1) it inappropriately relies upon Payment Requisition 22R, and (2) that Eric Schatz, who prepared the analysis, did not consult Perkins as to "(a) how PEA conducted its review and certification of IDI's payment requisitions, (b) what the site conditions actually were at the time PEA reviewed IDI's work in connection with the payment applications; (c) what PEA's mark-ups of IDI's pencil requisitions showed . . . and, (d) what work was included in IDI's schedule of values." Def.'s Mem. at 14-15; Williams Aff., ¶¶ 15-16.

On the other hand, the Sureties dispute that Schatz's report is their sole proof for the Eighth Claim. Schatz Aff., ¶ 21 n. 3. In support of their position, the Sureties provide a detailed description of the methods used to calculate Perkins' purported overpayment. Specifically, the Sureties explain that their analysis is based upon IDI Pay Requisition No. 22R ("22R"), which was informally agreed to by Payton Lane, Perkins and IDI just prior to IDI's termination. *Id.*, ¶ 22 and Ex. 10. According to the Sureties, 22R's value of $173,617.00 "represented the incremental work performed by IDI between September 20, 2003 and April 16, 2004. Only five of the items in 22R . . . are included in the Sureties' calculation of the overpayment claim. Thus, 98.6% of the Sureties' overpayment claims against Perkins rely on Perkins pre-22R certifications." *Id.*, ¶ 22.[8] The Sureties also provide specific examples of what they assert are "individual components of the project that were wrongfully certified for payment[,]" and Perkins' knowing approval of non-conforming work for payment. *Id.*, ¶¶ 29-31; Pls.' Mem. at 11-12.

Moreover, the Sureties rely upon applicable provisions from HUD Handbook 4460.1, entitled "Architectural Analysis and Inspection for Project Mortgage Insurance" (the "HUD Handbook") (Schatz Aff., Ex. 5), which, at the very least, creates an issue of material fact as to whether Perkins breached its obligations under the PEA Agreement. Schatz Aff., ¶¶ 6-8.[9] For

---

[8]    In other words, the Sureties concede, Perkins could argue that the five line items from 22R which the Sureties included in their analysis (one "Fire Sprinkler line item for $9,950.00 and four "Electrical" line items totaling $38,850.00) should have been excluded from the Sureties' calculation. However, the Sureties maintain, compared to their multi-million dollar claim, "this is hardly a significant flaw." Schatz Aff., ¶ 22.

[9]    According to the Sureties, as part of the PEA Agreement, Perkins represented that it is "familiar with HUD requirements, including . . . Handbook 4460.1 Rev 1 Architectural Analysis and Inspection For Mortgage Insurance, as set forth in publications given to [it] by HUD for this Project and will perform all services in accordance with the applicable

26

example, under Paragraph 3-10, entitled "Architect's Duties in Administering Construction Contract," the Architect is required to "[p]rocure construction in accord with the contract documents[,]" and "[w]hen arriving at the net amount due on every requisition, compare the cost of the work and materials with the cost to complete the project.  Current and previous payment must relate to the total cost for completion."  HUD Handbook 4460.1 (Schatz Aff., Ex. 5), ¶ 3-10(C)(4).  The Sureties contend that "[b]y approving payments to IDI that left a gross deficit between the actual cost to complete and the amount remaining in IDI's contract," Perkins breached its duty to administer the construction phase of the Project in compliance with its obligations under the PEA Agreement and HUD Regulations.  Schatz Aff., ¶ 27.  The Sureties further argue that "Perkins knew by early 2003 that it would cost some $4.8 million above the remaining contract balance to complete the Project[, h]owever, Perkins continued to certify at least five additional payments to IDI after May 12, 2003, resulting in additional payments of $2,666,655 to IDI. . . ."  *Id*., ¶ 28.  By doing so, according to the Sureties, Perkins failed to "exploit all avenues to obtain compliance with the contract" and to "guard the owner and HUD against defects and deficiencies in the construction," which Perkins was obligated to do under HUD Regulations.[10]  *Id*.; HUD Handbook 4460.1 (Schatz Aff., Ex. 5), ¶ 3-11.

---

requirements of HUD."  Schatz Aff., ¶ 6.  The Sureties further note that a copy of the referenced HUD Handbook 4460.1 was produced by Perkins during the course of discovery in this action. *Id*. and Ex. 5.

[10]     Perkins also assert that, in addition to its own review and certification of IDI's payment requisitions, the HUD inspector assigned to the Project "observed and evaluated the actual work in place" and "*agreed and certified* that the percentages certified by PEA accurately reflected the work in place."  Def.'s Mem. at 16 (emphasis in original); Williams Aff., ¶ 15 n. 2 and Ex. 2.  According to Perkins, the HUD's inspector's observations are "the only true independent proof Plaintiffs can reply upon . . . ."  Def.'s Mem. at 16.  However, in light of the Court's conclusions here, the weight to be given to the HUD's Inspector's certifications is an issue to be determined at trial.

Viewing the evidence and all factual inferences arising from that evidence in the light most favorable to the Sureties, as the Court must, the Court finds that there exist material issues of fact as to (1) the scope of Perkins' obligations under the PEA Agreement to administer the construction phase of the Project, and (2) whether Perkins fulfilled those obligations. Therefore, the Court finds that Perkins has not met its burden to establish that there is no issue of material fact whether it fulfilled such duties, and that issue, as well as the sufficiency of the Sureties' proof in support of its Eighth Claim, must await trial.

In addition to the arguments analyzed above, Perkins made two other assertions in support of its motion for summary judgment, namely, that (1) under the PEA Agreement, Perkins' review of IDI's requisition requests is subject to several contractual conditions which had not been met at the time Perkins certified such requests, and (2) because Payton Lane withheld from IDI a ten percent retainage, Payton Lane (as the Sureties' subrogor) did not incur damages as a result of the alleged overpayment to IDI. However, in light of the Court's finding that there are genuine issues of material fact whether Perkins fulfilled its obligations under the PEA Agreement, it is unnecessary for the Court to address these additional arguments at this time.

## VI.   CONCLUSION

For all of the foregoing reasons, Perkins' Motion for Summary Judgment on the Sureties' Eighth Claim is DENIED.

**SO ORDERED.**

Dated:  Central Islip, New York
        February 2, 2010

                                        /s/ A. Kathleen Tomlinson
                                        A. KATHLEEN TOMLINSON
                                        U.S. Magistrate Judge